**STATE OF CALIFORNIA v. UNITED STATES (three cases).**

No. 11797.

United States Court of Appeals
Ninth Circuit.

Sept. 1, 1948.

Fred N. Howser, Atty. Gen., State of Cal., and Harold B. Haas, and Miriam E. Wolff, Deputy Attys. Gen., for appellant.

A. DeVitt Vanech, Asst. Atty. Gen., M Mitchell Bourquin, Sp. Asst. Atty. Gen., and John F. Cotter, George S. Swarth and Elizabeth Dudley, Attys., Dept. of Justice, all of Washington, D. C. for appellee.

Before GARRECHT, MATHEWS and BONE, Circuit Judges.

GARRECHT, Circuit Judge.

The monetary value, for condemnation purposes, of tide and submerged lands mapped out as streets eighty years ago by the California Board of Tide Land Commissioners, constitutes the central question in these appeals.

Three judgments, involving four parcels of land covered by the waters of San Francisco Bay, awarded the appellant $1 for its interest in each parcel. The actions were consolidated for trial and have been consolidated for purposes of appeal.

The appellant urges that the judgments of the lower court awarding nominal damages in its favor are erroneous, and asks that "this Court either find the value of this property or direct the trial Court to make such finding."

The question involved in these appeals has already been before this Court. State of California v. United States, 9 Cir., 153 F.2d 558, 559. There we held that "It was error to permit the State to intrude into [a] valuation proceeding a claim which obviously represented only a minor part of its total claim," and we accordingly struck from the judgment below a paragraph denying the State any recovery.

### 1. The Facts.

Except as to the crucial point of valuation, the facts have been stipulated.

Prior to September 9, 1850, part of the land subject to the condemnation action, and all of the lands claimed by the appellant, were tide and submerged lands covered by the waters of San Francisco Bay. On the said date, the appellant was admitted into the Union of States, and therefore acquired title to all tide and submerged lands involved in these consolidated cases.[1]

By an act approved March 30, 1868, the Legislature of California created a Board of Tide Land Commissioners, hereinafter referred to as "the Board." Statutes of California, 1867-8, c. 543, page 716. In that enactment, the Board was authorized and directed to take possession of all the salt marsh and tidelands and lands lying under water, situated in the City and County of San Francisco, and to cause those lands to be surveyed to a point within 24 feet of water at the lowest stage of the tide.

The Board was further directed that, after the completion of this preliminary survey, it should establish the Water Line Front of San Francisco, and cause all of the property belonging to the State lying south of Second Street within the City and County, to be surveyed into lots and blocks.

The Act further authorized the Board to prepare maps of the area as resurveyed, and to cause the lots *as so established* to be sold at public auction. Pursuant to the statute, the Board caused the surveys to be made, and prepared the "Map of Salt Marsh and Tide Lands and Lands Lying Under Water," which was duly adopted by the Board on March 19, 1869.

None of the lands claimed by the appellant in the answers in these consolidated cases had been reclaimed at the time the present actions were commenced, all the lands so claimed being tide or submerged lands.

The lands in question were taken and condemned under Congressional authority, not here questioned, for the expansion of facilities at the Naval Dry Docks, Hunters Point, San Francisco, California.

### 2. The Issues.

So great is the gap between the theory urged by the appellant and that maintained by the appellee, that the parties are unable to agree even as to a statement of the issues here presented.

As conceived by the appellant, the question before the court is: "What is the proper value to be ascribed to land retained by the State of California in full fee ownership where the land at the date of the taking lies 20 feet under the waters of the Bay, and where the adjacent property had been conveyed out of the State of California pursuant to an Act of 1868 [supra]."

The appellee, on the other hand, states the problem as follows: "Whether land retained by the State of California for the sole purpose of providing ingress and egress to lots it had previously sold had more than a nominal value."

The discrepancy between these two statements stems, of course, from the fact that neither is entirely objective. Each is adulterated with a certain amount of argumentative material.

A fairer phrasing, we think, might perhaps be the following: "What is the proper valuation in a condemnation proceeding for tracts of land laid out as streets by the California Board of Tide Land Commissioners in 1869, which tracts were under 20 feet of water at the time of taking, in 1942?"

It will simplify the consideration of the present controversy if the areas of agreement and of disagreement between the parties are even more precisely outlined. In its statement of points on which it intends to rely on this appeal, the appellant asserts that the court below "erred in not finding that said property was never laid upon the grounds as streets."

Furthermore, Harold E. George, an associate civil engineer of the appellant's Division of State Lands, testified that the

---

[1] In view of this stipulation, the issue of federal vel state ownership of tidelands is not here presented. See United States v. California, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889; Id., 332 U.S. 804, 68 S.Ct. 20.

pink markings on a certain "blown-up" map indicated "the areas that were intended as streets by the surveyor who made this map for the Tide Land Commissioners." The blown-up map was made from a portion of the Tide Land Commissioners' map of March 19, 1869, supra. Both maps are in evidence here, and the appellant plainly states in its opening brief that "The parcels, which are the subject of this appeal, are marked in pink" on the blown-up map, which is one of the appellant's own exhibits.

Accordingly, we can take as an established fact that the areas in question at least were *laid out* as streets on the map of the Tide Land Commissioners.

The real issue between the parties as to the status of those areas is whether or not, in law and in fact, the strips of land were actually streets at the date of the taking in condemnation. Assuming that the designation of the tracts as "streets" on the map of the Tide Land Commissioners was at most only an "offer of dedication," the appellant stoutly denies that such offer was ever accepted by any authority.

Moreover, the appellant argues that even if this Court should find that the State of California retained the strips of land for the purpose of providing ingress and egress to the lots, the appellant is entitled to more than a nominal value for the tracts, because they were not actually used for ingress and egress and were in exactly the same condition as the adjacent property.

Finally, the appellant condemns the method of valuation employed by the appellee's two witnesses, one of whom was Director of Property for the City and County of San Francisco. They testified that "the value that was in the area taken by the streets is absorbed by the land that is sold plus an additional value to that land," and that "the value of the roadways, streets, strips, or whatever you choose to call them is reflected in the abutting property." Each of these two experts stated on the stand that the strips in each parcel were worth an aggregate of $1, or $4 for the entire group of street areas here in question.

It is agreed, however, "that the condemner must compensate for property in the condition that he finds it."

In reality, the present controversy involves two separate issues of law and fact:

1. At the time of taking, were the strips of land "streets," in the contemplation of law?

2. If so, what was the proper valuation that should have been given to them in a condemnation proceeding?

With the questions thus clarified, we can now proceed to a consideration of the case on its merits.

3. The Law That Governs.

During the oral argument, there was some discussion as to whether federal or state law controlled the instant case. The answer, of course, is that each plays a certain part in the determination of the issues here presented.

In United States v. Miller, 317 U.S. 369, 379, 380, 63 S.Ct. 276, 283, 87 L.Ed. 336, 147 A.L.R. 55, rehearing denied, 318 U.S. 798, 63 S.Ct. 557, 87 L.Ed. 1162, the rule was broadly laid down that matters of substantive right were to be determined according to federal law, while questions of form and procedure were to be settled by the law of the State. There the court said: "We need not determine what is the local law, for the federal statutes upon which reliance is placed require only that, in condemnation proceedings, a federal court shall adopt the forms and methods of procedure afforded by the law of the State in which the court sits. They do not, and could not, affect questions of substantive right,—such as the measure of compensation,—grounded upon the Constitution of the United States."

In a later decision, there was recognized the thrust of state law in the classification of property taken in condemnation. In United States ex rel. T. V. A. v. Powelson, 319 U.S. 266, 279, 63 S.Ct. 1047, 1054, 87 L.Ed. 1390, the court used the following language: "The right of the United States to exercise the power of eminent domain is 'complete in itself' and 'can neither be enlarged nor diminished by a State.' [Case

cited] Though the meaning of 'property' as used in § 25 of the [Tennessee Valley Authority] Act [of 1933, 16 U.S.C.A. § 831x] and in the Fifth Amendment is a federal question, it will normally obtain its content by reference to local law."

Finally, the rule was further clarified in the case of United States v. Petty Motor Co., 327 U.S. 372, 380, 381, 66 S.Ct. 596, 600, 90 L.Ed. 729. That case involved problems relating to the just compensation for tenants in condemnation proceedings to take their entire leaseholds when the United States had already taken the lessors' interest in the property that the tenants occupied. Regarding the impact of state law upon such problems, the court said: "Upon a new trial, each tenant, other than the Independent Pneumatic Tool Company, should be permitted to prove damages for the condemnation of its rights for any remainder of its term which existed after its ouster by the order of possession but not costs of moving or relocation. The remainder which may exist *will depend upon the Utah law* on the requirement for notice to terminate the tenancies at will. Some tenants of this group will not be entitled to anything because the notice given them by the order of possession is more than *the Utah statutory requirement*. The value of the remainder of the term of the Petty Motor Company's lease includes the value of the right to a renewal for a year, *if such right continues under Utah law, * * * "²* [Emphasis supplied].

◼ Applying the foregoing principles to the case at bar, we deduce the following propositions:

1. Whether a strip of submerged or tide land in California is a "street" is to be decided according to California law.

2. If, under California law, the strip is found to be a "street," the valuation to be given to it is to be determined according to federal law.

4. The Strips in Question Were "Streets."

(a) The California Statutes.

◼ The legal status of areas such as those which we are now considering was indicated by two statutes enacted by the Legislature of California during the late sixties and the early seventies of the last century.

In our summary of the stipulated facts, we have briefly reviewed the Act of 1868, supra. Scrutinizing the text of that law more closely, we find that it sheds additional light upon the issues here presented.

In the first place, § 4 of the Act authorizes and directs the Board, in surveying the submerged land, to reserve "so much thereof for *streets,* docks, piers, slips, canals, drains, or other use necessary for the public convenience and the purposes of commerce, as in their judgment may be required, and have two maps of the same prepared showing the property as re-surveyed to the water line front, the *streets,* blocks, reservations, and everything necessary to be shown by such maps." [Emphasis supplied].

Section 5 provides that the Board shall then sell at public auction the State's title to the lots described in § 4, adding that "Such sale shall be *by lots,* in accordance with the survey and map provided for in section four."

Section 6 prescribes that notices of sale "shall specify the property to be sold, by its numbers and locality as to *streets,* and by any other descriptions deemed necessary to inform purchasers."

The Act of 1868 was amended by Chapter 388 of the Statutes of California of 1869–70, pages 541, approved April 1, 1870. This latter statute gave the Board jurisdiction over not only all the salt marsh and tide lands lying under water and belonging to the State of California that were situated in the City and County of San Francisco, but also to all such lands, to nine feet of water at low tide, within five statute miles outside of the exterior boundaries of the City and County. (Section 1).

Section 3 again provided that sales should be "by lots." This emphasis upon

---

² See also, State of Nebraska v. United States, 8 Cir., 164 F.2d 866, 867, 868; United States v. City of New York, 2 Cir., 165 F.2d 526, 528; Kimball Laundry Co. v. United States, 8 Cir., 166 F.2d 856, 862; United States v. 19,573.59 Acres of Land, D.C.Neb., 70 F.Supp. 610, 611, 612.

sales by lots is important, as will be seen hereafter.

Finally, the Act of 1868, in so far as it provided for a "Board of Tide Land Commissioners," was repealed by the Act of March 30, 1874, Statutes of California of 1873–74, c. 611, page 858. The powers of the old Board were turned over to the "State Board of Tide Land Commissioners."

Up to this point, it seems established beyond cavil that there was at least a formal *offer* of dedication of the strips in question to public use. Since the appellant insists, however, that the offer was never *accepted* "by any authority," we must push our inquiry further.

(b) What Is a "Street"?

■ In California, the basic meaning of the term "street" does not differ from that generally accepted in the general law.

In Earl v. Dutour, 181 Cal. 58, 60, 183 p. 438, 6 A.L.R. 1163, the court thus defined the word: "As stated by the Supreme Court of Indiana: 'Lot and street are two separate and distinct terms, and have separate and distinct meanings. The term "lots," in its common and ordinary meaning, includes that portion of the platted territory measured and set apart for individual and private use and occupancy. While the term "streets" means that portion set apart and designated for the use of the public, and such is the sense in which such terms will be presumed to have been used, unless it be made to appear that a contrary meaning was intended.' Montgomery v. Hines, 134 Ind. 221, 225, 33 N.E. 1100."

See also San Francisco-Oakland Terminal Railways v. County of Alameda, 66 Cal.App. 77, 81, 225 P. 304.

The state acceptation of the term accords with that adopted by the federal courts. The word was thus defined in Boston & M. R. R. v. Daniel, 2 Cir., 290 F. 916, 918: "No one would seriously contend that 'street' meant other than a public highway. 'Street' is defined, for instance, in the Standard Dictionary as 'a public way * * * in a city, town, or village. * * *'"

(c) There Was a "Complete" Dedication of These "Streets" to the Public.

A. The Effect of a "Complete" Dedication.

■ Keeping in mind the appellant's insistence that the strips in question were not completely dedicated to the public— i. e., that there was merely an *offer* but no *acceptance* of dedication—we must turn to California jurisprudence to ascertain what the courts have there said regarding the "complete" dedication of a street.

Referring to dedication generally, the Supreme Court of the State used the following language in Archer v. Salinas City, 93 Cal. 43, 51, 28 P. 839, 841, 16 L.R.A. 145, cited by the appellant itself: "Dedication is an ultimate fact dependent upon the establishment of other facts, and is to be found from the evidence presented to the court. [Case cited] It results from the acts of the owner of the land, coupled with the intent with which he does those acts. It may be express and completed by a single act, as when the land is dedicated by deed; or it may be implied from a series of acts, as when the owner subdivides a tract of land into blocks and streets, and causes a map of such subdivision to be recorded, and sells the several subdivisions which front upon those streets. Whenever the dedication is complete, the property thereby becomes public property, and the owner loses all control over it, or right to its use. * * * If the dedication is complete by his act, whether express or implied, it is thereafter irrevocable by him, and the effect of such dedication cannot be qualified by any act or declaration thereafter made on his part. The property dedicated has become public property impressed with the use for which it was dedicated, and neither can the public divert it from that use nor can it be lost by adverse possession. *Nor is the effect of such dedication impaired by any delay in the use of the land for which it was set apart. Such failure to make use of the land does not authorize the owner to resume possession. The public can thereafter appropriate the land to the use for which it was dedicated, whenever convenience or necessity may suggest.*" [Emphasis supplied].

920

See also 9 Cal.Jur. § 41, page 53, and Davidow v. Griswold, 23 Cal.App. 188, 193, 137 P. 619, hearing denied by the State Supreme Court.

B. The Sale of Lots by the State According to One of Its Own Maps Showing a "Street" Is a Complete Dedication.

■ Photostatic copies of deeds executed by the Board, "for and on behalf of the State of California," to private grantees, give the boundaries of the lots sold as being the "streets" and "avenues" involved herein. Having held out these strips as streets, the appellant cannot now be heard to say that they have not been completely dedicated to the public.

As early as 1852, at the very beginning of California's statehood, the doctrine that we are here supporting was regarded as well settled by the Supreme Court of the Commonwealth. In Breed v. Cunningham, 2 Cal. 361, 368, 369, it was said: "Prior to the contract between the sinking fund commissioners and the plaintiffs, this same space had been laid out upon the official map and dedicated as a public street; the Ayentimento [sic] of San Francisco had assumed the ownership and control of the, soil, *and had sold lots upon the line of the street. So far as the city had any rights in the premises, she had by her own repeated voluntary acts parted with those rights;* and any attempt upon her part to to assume such rights, by depriving the public of the easement which they had acquired, or denying the purchasers of these lots the right of way, or the privilege of improving their property, except on the payment of wharfage, or tolls, was clearly illegal. In addition to these acts of the municipal authorities of this city, the legislature on the 26th day of March, 1851, relinquished all rights of the State to certain property heretofore claimed by this city, and confirmed the sales previously made. *This act was made in reference to the map of San Francisco, and Market Street was recognized as a public street by the language of the act. The act March 26th, operated as a grant* by which property holders along the line of said street, *and*

*the public,* were entitled to the free enjoyment of the same; *and the right or privilege so granted could not be resumed by the State,* and was not so resumed by the act of April 28, 1851, confirming the contract between the appellants and the sinking fund commissioners. *It is useless to cite authorities to maintain the proposition. So firmly has it become established, that where lots are sold as fronting on, or bounded by, a certain space designated in the conveyance as a street, the use of such space as a street, passes as appurtenant to the grant, and vests in the grantee in common with the public the right of way over such street; that such acts on the part of the grantor constitute a dedication of such street, and that he cannot afterwards so sell or dispose of it as to alter or defeat such dedication."* [Emphasis supplied].

It should be carefully noted that in the foregoing case, a public body—i. e., the *ayuntamiento,* or town council of San Francisco—and not a private individual, was the grantor. Accordingly, it was held that neither the city, which had sold lots as fronting on Market Street, nor the state, which had confirmed the sales, could "alter or defeat such dedication."

So here, the Board, a creature and an agent of the State, sold lots as fronting on the streets involved in the instant case. The appellant cannot now be heard to "alter or defeat such dedication."

C. The Sale of Lots According to a Map Authorized by the Act of 1868 Constituted a Complete Dedication.

■ Applying the foregoing principles to the specific statute that we are here considering, we find that the Act of 1868 plainly authorized its creature, the Board, to "reserve" certain portions of the tidelands "for streets"; to have two maps prepared showing such "streets"; and to sell at public auction the property subject to its jurisdiction "by lots, in accordance with the survey and map."

The appellant's own exhibits in the instant case show that the Board caused the survey and the maps to be made, and sold parcels of the tidelands "by lots," all as commanded by the statute.

In McGinn v. State Board of Harbor Commissioners, 113 Cal.App. 695, 702, 703, 299 P. 100, 103, hearing denied by the State Supreme Court, it was said, with reference to the very statute that we are now considering: "Secondly, the state, as the owner of these tide lands under special grant from the United States, was authorized to plot and sell the land into private ownership. In order to make these sales, the tide land commissioners were directed to lay out the land in blocks and lots showing streets, lanes, alleys, and other public places, and to sell the land *by lot number*. In these transactions the state, through its duly authorized agents, was acting purely in its proprietary capacity. Having authorized the preparation of the map and having approved the map as filed with the streets, lanes, and other public places delineated thereon, the state stood in the same position as all owners of private property, and must therefore be deemed to have dedicated to public use all the public highways and places as delineated upon that map. Having immediately sold these lots in accordance with the map, the state was without authority thereafter to withdraw from public use any of the streets shown upon the map * * *"

The appellant seeks to weaken the impact of the McGinn case, supra, by pointing out that a private seller in California does have the right "to withdraw the dedication as far as the public is concerned." In support of this contention, there are cited a number of cases tending to establish the rule that a private seller may indeed withdraw an offer of dedication *before* the offer has been accepted by the public.

As we shall see in a moment, however, in a case where the state or a municipality *itself* has made the dedication by formal act, an acceptance on behalf of the public is unnecessary.

D. Formal Dedication by a Public Body Does not Require Acceptance.

Several well-reasoned decisions of the Supreme Court of California, not cited by counsel, have definitely established that when a formal dedication of a street is made by the State or by a municipality, no acceptance is necessary.

The leading, though not the first, case on this subject is Mills v. City of Los Angeles, 90 Cal. 522, 530, 531, 27 P. 354, 356, where the rationale of the doctrine is thus ably expounded:

"The Ord Map, made in 1849, *being the official map of the city, is evidence that as early as 1849 the premises were declared a public street*. That it was occupied by a trespasser would not affect the dedication. * * *

"*There was no necessity for an acceptance by the public by using the proposed street to complete the dedication. The city was not only the proprietor, but the political authority to lay out, establish, and to accept streets which were offered to the public by way of dedication.* In City of Eureka v. Armstrong, 83 Cal. 623, 22 P. 928, 23 P. 1085, it was said: 'The common council must be the proper body to accept a dedication. If not, who is there that can give a formal acceptance?'

"The pueblo [of Los Angeles] was, or represented, the proprietor. Its authorities also represented the public, and were authorized to lay out streets. * * * Lots cannot be sold or villages built up without streets. At first streets would naturally exist only on paper. But they were necessary to designate the lots and the different classes of land belonging to a pueblo. Whether they had been accepted and used by the public, so that they could not have been changed or otherwise disposed of by the municipal authorities, is not material to this inquiry." [Emphasis supplied].

The Mills case has never been overruled or criticized by the State Supreme Court, bu on the contrary was cited with approval on this very point in Holladay v. San Francisco, 124 Cal. 352, 358, 57 P. 146.

Again, in People v. Beaudry, 91 Cal. 213, 221, 27 P. 610, 612, the highest tribunal of the State used the following language: "2. It is also contended that there was no evidence showing that Buena Vista street was ever dedicated to the public as a public highway. *But the city had power*

to lay out and dedicate streets, and on map No. 3 *Buena Vista Street was clearly marked out and defined. It would seem, therefore, that when the ordinance was passed and the map adopted and filed as an official map of the city, it must have been intended that the streets represented on the map should thereafter be public streets of the city. It was not necessary that they should have been actually constructed and made ready for travel at that time.* We think, therefore, if the city owned the land represented as Buena Vista Street, that the ordinance and map, in the absence of any showing to the contrary, *should be held sufficient evidence of a dedication of the land to the public as a public street.*" [Emphasis supplied].

See also 9 Cal.Jur. § 41, page 53.

If it be argued that the foregoing authorities all refer to dedications by municipalities and not by the *State* or any of its lawfully constituted boards, the answer is twofold.

Obviously if a city, with limited sovereign powers, can effect a complete dedication merely by filing an official map and selling lots according to it, a fortiori the State, a complete sovereign, can do so.

Secondly, the Supreme Court of the State has already indirectly passed on this specific question. In Hoadley v. San Francisco, 50 Cal. 265, 273, the court assumed the invalidity of certain ordinances of the City and County of San Francisco and of a plan and map adopted by an order of the justices of the peace, exercising the powers of a board of supervisors. Nevertheless the court said: "It is contended that the order of the justices of the peace was void, on the ground that they could not be invested by the Legislature with power to perform duties of that character; but it is unnecessary to determine that question, for, conceding it to have been void, the question to be determined is, what was the effect of the act of March 11, 1858 [of the State Legislature], in ratifying the ordinances and the order, *all of which were void at the time of their adoption;* that is to say, void so far as they attempt to convey titles to private persons, and to select and dedicate to public use the squares in-volved in this case? *The act of March 11, 1858, ratifying and confirming the ordinance and order there recited, operated, as we construe it, as a selection and dedication to public use of the squares in controversy, and no further acceptance by the public, than was afforded by the act, was needed in order to make the dedication complete.*" [Emphasis supplied].

Applying the language of the foregoing decisions to the case at bar, we may say that the Board "had power to lay out and dedicate streets"; that when the map was adopted and filed as an official map, "it must have been intended that the streets represented on the map should thereafter be public streets"; that "there was no necessity for an acceptance by the public by using the proposed [streets] to complete the dedication"; and that the Board "was not only the proprietor [as lawful agent for the State], but the political authority to lay out, establish, and to accept streets which were offered to the public by way of dedication."

Finally, we may well say, in the language of City of Eureka v. Armstrong, supra [83 Cal. 623, 22 P. 929], that the Board was "the [only] body to accept a dedication. If not, who [was] there that [could] give a formal acceptance?"

Can the appellant seriously contend that the Board, having "duly adopted" the map in question, showing certain strips laid out as "streets" and "avenues," was obliged to accept *from itself* on behalf of the public the same streets and avenues which it had already dedicated to that same public by the very adoption of the map?

The question reveals its own absurdity by the mere asking. The law does not expect state boards or common councils to do vain and useless things.

E. Tideland Streets Are Capable of Complete Dedication.

The appellant asserts that "In order that there be a dedication and acceptance in this case, it is our contention that it would first have been necessary to raise this land above the waters of the Bay of San Francisco."

Tested in the light of the jurisprudence of the State of California, the foregoing thesis is wholly untenable. In a line of decisions not referred to by counsel, the Supreme Court of the State has clearly established that submerged lands *are* fully capable of being dedicated as "public highways."

In City of Oakland v. Oakland Water Front Co., 118 Cal. 160, 179, 190, 50 P. 277, 284, the entire subject was lucidly elaborated:

"By the act of March 26, 1851, to provide for the disposition of the 'beach and water lots' of San Francisco (Stats. 1851, p. 307), a permanent waterfront of the city was established. *The boundary of this waterfront was traced along the outer edge of the outermost streets* as delineated on the map of a survey that had been previously made of the city front, and *which extended beyond the line of low tide a considerable distance out into the bay, and to deep water. * * * The waterfront established by law and ship's channel are coterminous. The line to which the city may extend its streets, and within which it may sell lots and authorize the purchasers to fill them up and occupy them, is waterfront.* Immediately beyond is ship channel, and *it includes all the space between the piers and wharves, which by the act of May 1, 1851 (Stat. 1851, p. 311), the city was authorized to extend from the end of every street terminating at the waterfront 200 yards out into the channel.*

&ast; &ast; &ast; &ast; &ast; &ast;

"The grant to San Francisco was of the lots platted upon a survey showing streets extending to and along the permanent waterfront of the city; and authority to sell the lots was expressly conferred, and was subject to no condition, express or implied, except the return of a percentage of the proceeds to the state. * * * The right of access to the waterfront, and of sites for wharves, etc., was secured in advance by a *dedication of the streets connecting the upland with the ship channel,* and covering its whole length. No power of the cor-

poration was in the slightest degree impaired, and no right of the public infringed, by the sale of the lots bounded by these *public* highways." [Emphasis supplied].

In Shirley v. City of Benicia, 118 Cal. 344, 346, 50 P. 404, 405, the court said: "The city of Benicia, it is seen, *reserved from sale and held for public use,* much of this land in the form of *streets.* In particular it was careful to preserve a strip of land 60 feet in width between the waterfront line and the lands which it sold into private ownership. *These streets are covered by water,* it is true, but, where legislative authority exists, it is not to be questioned that the streets themselves may be converted into public wharves, or such structures may be built along them, or at their termini." [Emphasis supplied].

The opinion in West Berkeley Land Co. v. Berkeley, 164 Cal. 406, 408, 129 P. 281, 282, construed the Benicia case, supra, with apparent approval, as fully recognizing "the right of a city to reserve portions of the lands lying below tide water within its limits for street purposes."

See also the excerpt from the McGinn case, supra, 113 Cal.App. at pages 702, 703, 299 P. 100, which we have already quoted.

Accordingly, we conclude that the strips in question, in contemplation of California law, were completely dedicated public streets, at the time of the taking in condemnation.

### 5. The Awards in Condemnation for the Streets Were Proper.

Once it is determined that the strips in controversy were "streets" according to state law, the question of their proper valuation under federal law is not perplexing. The standard of value that is to be observed has been clearly established by the decisions.

#### (a) The "Owner's Loss" Rule.

█ It is a well-settled rule that it is the owner's loss, not the taker's gain, which is the measure of the value of the property taken.[3] We are not therefore

3 United States ex rel. T. V. A. v. Powelson, supra, 319 U.S. at page 281, 63 S.Ct. 1047; United States v. Causby, 328 U.S. 256, 261, 66 S.Ct. 1062, 90 L.Ed. 1206.

here concerned with the value to the appellee of these strips in the expansion of its dry dock at San Francisco. Our inquiry must be directed solely to the question of how much the appellant *lost* by being forced to give up these tracts of land that it asserts were from 20 to 24 feet under the waters of the Bay.

(b) The Value of a Street to a City or a State.

A. In General.

■ It is a fundamental principle that a city, a State, or other governmental entity "cannot deal in its roads and highways as a private corporation and thus when such property is taken by the power of the Federal Government, just compensation cannot be measured by the same standards as compensation for the taking of purely private property."[4]

In the words of Mayor and City Council of Baltimore v. United States, 4 Cir., 147 F.2d 786, 789, "The fact is that the value of the land in the bed of the highway as land has been diminished by its devotion to a limited purpose."

B. The Duty to Substitute Other Streets.

■ The overwhelming weight of modern authority is to the effect that a municipality, a county, a State, or other public entity is entitled to compensation for the taking of a street, road or other public highway *only to the extent that, as a result of such taking, it is compelled to construct a substitute highway.*

In the recent case of United States v. Los Angeles County, 9 Cir., 163 F.2d 124, 125, we used the following language: "The $16,282 awarded to the County was awarded as being the market value of the County's easement. That easement had, and could have had, no market value. Instead of awarding the supposed market value thereof to the County, the court should have ascertained, and should have awarded to the County, the cost of providing a substitute road to replace that part of the Anaheim Road which was on the above mentioned tract of land and was taken by the Government as part of that tract."[5]

The doctrine applies with equal force whether the public entity owns the fee in the roadbed or merely holds title to an easement thereon as trustee for the benefit of the public. If, as here, the governmental unit owns the fee simple, the existence of the easement reduces the value of the public street or road to a nominal sum. In the language of Mayor and City Council of Baltimore v. United States, supra, 147 F.2d at pages 789, 790, "In such case the ownership of the incumbered fee has no substantial value. It cannot be used for any purpose which will bring to the owner either profit or enjoyment. It is a burden rather than a benefit, and its taking relieves the owner of the burden."

In United States v. 0.886 of an Acre of Land, etc., D.C.N.Y., 65 F.Supp. 827, 828, 829, the land in question was "owned by the Town of Babylon, * * * the sole and only fee simple owner." There the court said:

"In the acquisition of a public road by condemnation we need not spend any time on the question of the value of the fee taken, the real issue remaining is as to compensation for a reasonably substitute road or nominal damages.

* * * * * *

"Thus, if it is unnecessary to replace a road or to provide a substitute, the claimant here has suffered no money loss and has been relieved of the burden of maintaining the road taken."

■ Nor is there any significance to be

---

4 Jefferson County, Tenn. v. Tennessee Valley Authority, 6 Cir., 146 F.2d 564, 565, certiorari denied, 324 U.S. 871, 65 S.Ct. 1016, 89 L.Ed. 1425, rehearing denied, 324 U.S. 891, 65 S.Ct. 1024, 89 L. Ed. 1438; United States v. 1,433 Acres of Land, etc., D.C.Kan., 71 F.Supp. 854, 856.

5 Mayor and City Council of Baltimore v. United States, supra, 147 F.2d at page 790; United States v. Des Moines County, Iowa, 8 Cir., 148 F.2d 448, 449, 160 A.L.R. 953, certiorari denied, 326 U.S. 743, 66 S.Ct. 56, 90 L.Ed. 444; Woodville, Okl. v. United States, 10 Cir., 152 F.2d 735, 737, certiorari denied, 328 U.S. 842, 66 S.Ct. 1021, 90 L.Ed. 1617; United States v. City of New York, 2 Cir., 1948, 168 F.2d 387, 389, 390, and many other cases there cited.

attached to the fact that in the instant case it was the State, and not a political subdivision thereof, which was the owner of the fee in the strips we are here considering. In either case, the rule is the same.

In the United States v. State of Arkansas, 8 Cir., 164 F.2d 943, 944, the court said: "The proper measure of damages for the taking of public highways and streets in condemnation proceedings is well settled. The fundamental principle is that the *public authority* charged with furnishing and maintaining the public way, whether it be a highway, a street, or a bridge, must be awarded the 'actual money loss which will be occasioned by the condemnation * * *' This amount is usually *the cost of furnishing and constructing substitute roads.* [Many cases cited]." [Emphasis supplied].[6]

 In the instant case, with the land 20 or more feet under water at the time of the taking, there was scarcely any likelihood that the appellant would be called upon to build substitute highways for those that were condemned. The language in United States v. Certain Parcels of Land, D.C.Md., 54 F.Supp. 667, 671, affirmed sub. nom. Mayor and City Council of Baltimore v. United States, supra, is quite apposite here: "Unless and until the Federal Government abandons its public use of the property and deeds it back to private owners or to the City, there is no showing of any need for alleys, streets or other ways except such as the Federal Government or its licensees may require."

C. The Benedict Case.

The appellant relies most heavily upon the opinion in United States v. Benedict, 2 Cir., 280 F. 76, 80, 82, 83, affirmed on other grounds, 261 U.S. 294, 43 S.Ct. 357, 67 L.Ed. 662. Properly to evaluate that decision and its affirmance, we must examine its facts and the grounds upon which the writs of error were granted by the Supreme Court.

William C. Langley by will conveyed a considerable body of land in Brooklyn, consisting both of upland and land under water,

into trust with a power of sale. In compliance with that power, the trustees of the Langley estate conveyed certain portions of the property to the City of New York to be used as streets. The so-called streets were never opened or used as highways.

Thereafter the United States, under the Lever Act, 40 Stat. 276, in "a summary species of what are commonly called condemnation proceedings," acquired title to the Langley realty, including the area conveyed to the city for streets. An award was made to the Langley estate by the District Court at the rate of $2 per square foot for the entire property, streets and all. The United States and the city both brought error.

The Circuit Court of Appeals sustained the valuation of $2 per square foot, but modified the judgment of the District Court by holding that the city was entitled to a proration of the award, based upon the number of square feet held by the city, at the same rate per square foot.

The appellate court specifically disapproved of the holding of the trial court, to the effect that "whether or not the city held title" to the street areas the value of the entire property was the same, and that the Langley estate should receive the entire award. As to that aspect of the case, the Circuit Court of Appeals said:

"It is now argued that, with a title of this kind and on evidence proving that 'whether or not the city held title to' the 81,120 square feet the value of the entire property was just the same, and the award to the Langley estate should not be disturbed in amount. But, if the record be examined to ascertain why the expert witnesses substantially agreed that the value of the land was unchanged by the conveyance for street purposes, it is found that they all said in effect that the street value (i. e., land value of the streets) was 'reflected' in the value of the land as bounded or limited by the proposed streets.

"This means that, if and when the streets were opened, the abutting property would, by reason of the streets, be worth at least as much more as was the value of the land

6 See also Jefferson County, Tenn. v. Tennessee Valley Authority, 146 F.2d at page 565; United States v. Alderson, D. C.W.Va., 53 F.Supp. 528, 530.

appropriated for highway purposes. But no streets had been opened in the physical sense, and the city owns the surface to be devoted to streets. *That it is held in trust for a public purpose does not in any way change its market value,* and the city has been as much deprived of what it owned as was the Langley Estate. To put it another way, the Langley Estate has been awarded all that the land is worth, streets and all, because, when streets are opened, the land they have left will be worth the amount of the award. This will not do. The government is called upon to make just compensation for things as they are, not as they may be hereafter, and the compensation must flow to those who were actually deprived of what they own." [Emphasis supplied].

It is upon this language that the appellant herein especially relies.

Parenthetically, we must again observe that, if "The government is called upon to make just compensation for things as they are," and if "the compensation must flow to those who were actually deprived of what they own," the appellant here was "actually deprived" of lands 20 to 24 feet under water.

The city and the United States both sued out writs of error to the Supreme Court. The former complained that the amount of the award in its favor was not large enough, and the Government objected to the judgment because interest was allowed from the date of the taking. The Supreme Court dismissed the city's writ, affirmed the judgment as to the Government, and in no way touched upon the question that we are here discussing.

We find ourselves compelled to disagree reluctantly with the view of the Circuit Court of Appeals in the Benedict case to the effect that the holding in trust of land "for a public purpose does not in any way change its market value." As we have already tried to show at some length, such a doctrine is not in harmony with the views expressed in numerous later federal decisions.

. Furthermore, in the Benedict case the so-called "streets" had neither "been opened in the physical sense" nor had they been dedicated, as here, by the formal act of a creature and agent of the State, performed in obedience to a solemn mandate of the Legislature.

For both the foregoing reasons, therefore, we hold that the Benedict decision cannot have a controlling effect here.

6. Conclusion.

By way of recapitulation, we hold that, tested according to state norms, the strips in question were completely dedicated "streets"; and that, since they were streets, their value, according to federal standards, was merely nominal.

MATHEWS and BONE, Circuit Judges.

The foregoing opinion, prepared by Judge GARRECHT,* is concurred in by us and adopted as our own. Accordingly, the judgments appealed from are affirmed.

---

* Judge Garrecht died on August 11, 1948.