**COUNTY OF SARPY, NEBRASKA**

v.

**The UNITED STATES.**

No. 362–64.

United States Court of Claims.

Nov. 9, 1967.

454

Dixon G. Adams, Bellevue, Neb., attorney of record, for plaintiff.

Howard O. Sigmond, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COL-

LINS, SKELTON, and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on February 16, 1967. Exceptions to the commissioner's opinion and report were filed by the parties. The case has been submitted to the court on the briefs of the parties and oral argument of counsel. Since the court is in agreement with the opinion, and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Plaintiff is, therefore, entitled to recover and judgment is entered for plaintiff in the sum of $75,628, plus interest, as part of just compensation, at the rate of 4 percent from the date of taking in 1954, the amount to be determined pursuant to Rule 47(c).

Commissioner GAMER'S opinion,* as modified by the court, is as follows:

Plaintiff seeks, pursuant to a Private Act, $135,560 as compensation for the closing by defendant of a segment of one of its roads.

For many years prior to 1954 there existed in Sarpy County, Nebraska, a public road, maintained by the county, which originated in the western part of the town of Bellevue as an extension of one of its streets (Calhoun). The road ran generally south, bordering the then eastern boundary of the Offutt Air Force Base, and then continuing in a southerly direction to cross, by way of a steel truss bridge, a rather large stream in the area, Papillion Creek.

During World War II, the Martin Bomber Modification Plant was located on the grounds of the Base, and the part of the road between Bellevue and the Base, which part was paved (the balance of the road having a gravel surface), was used extensively to serve the plant. Consequently, it was then, and still is, frequently referred to as Modification Road (although the use of the plant was discontinued after the war). However, a county road in generally the same location as Modification Road has existed ever since 1870.

At the south end of the bridge, Modification Road connects with another county road, H-9, which although arching to the east, continues to run in a southerly direction through the village of La Platte, which is also in the county, and then connects with U. S. Highway 73-75 (hereafter "Highway 75").

Highway 75 is one of the main north-south highways in Nebraska. It generally serves the traffic between Omaha and Topeka, Kansas. Bellevue, the Offutt Air Force Base, La Platte, Modification Road, and the above-described part of County Road H-9, all lie east of the highway. The western edge of Bellevue is a little over a mile east of Highway 75, the western boundary of the Base borders it. Modification Road and its bridge crossing Papillion Creek are approximately three-fourths of a mile away, and La Platte lies about one-fourth of a mile away.

This area east of the highway is pocketed in on the east by the Missouri River, which is approximately 3 miles from Highway 75, and on the south by the Platte River, approximately 1 mile below La Platte. The Platte River enters the Missouri River around 2½ miles east of La Platte. The only way to cross the Platte River in this area is by Highway 75. Papillion Creek divides this pocketed area in two. The creek enters the area at the southwest corner of the Base where Highway 75 bridges over it, then meanders first southeasterly and then southerly, and then sharply curves to run east-west and to enter the Missouri River

---

* The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

456

around 1½ miles north of the Platte River.

In this area east of Highway 75, the only bridge crossing Papillion Creek is the Modification Road bridge. Thus, unless one went west all the way over to the highway, the only way to get from the lands on one side of the creek to the lands on the other was by way of Modification Road and its bridge.

Both before and after World War II, Modification Road with its bridge was frequently and regularly used by the residents and farmers of the area, as well as by others. In conjunction with County Road H–9, it formed a direct, short, through route between Bellevue and La Platte, all lying entirely east of Highway 75. In enabled those living north of the creek and south of Bellevue to go south to La Platte or points beyond simply by crossing the bridge. Similarly, it so enabled those living south of the creek to go north to Bellevue and points beyond (Bellevue being in the Omaha metropolitan area). Some farmers farmed lands on both sides of the creek. Some resided on one side and worked or farmed land on the other. La Platte was used for area voting purposes. In addition, the area school house for the lower grades was in this village. Farmers in the area north of the creek frequently used the road to transport farm machinery south to Plattsmouth, Nebraska for repairs, no such repair business being available in Bellevue. The road was frequently used to haul produce from farm to market, and supplies to the farms. A rendering plant was located just south of the bridge, and the road and the bridge were regularly used by persons from Bellevue going to and from the plant, as well as by the company's trucks. The Allied Chemical and Dye Corporation was, in 1954, building a plant east of La Platte and this activity also generated traffic over the road. And the county's employees themselves used the road frequently to travel south from the county garage located southeast of Bellevue to the county gravel pits and quarries located on the other side of the creek and beyond La Platte,

and then to return to the garage, where the maintenance materials were stockpiled.

In 1954, the main east-west runway at the Base was extended to the east and the entire Base consequently enlarged. The runway extension work resulted in the severing of that part of Modification Road which lay in the path of the runway. Modification Road had formerly bordered on the eastern edge of the Base. Now the Base extended farther east approximately a mile. The part of the road lying south of the Base, as well as the bridge over Papillion Creek, was left intact, but, going north, the road now ended at the Base, and there was no way from such point to get around the Base.

Thus, the Modification Road-County Road H–9 through route from the Bellevue to the La Platte areas was destroyed. Furthermore, the only way most of those in the pocketed area could thereafter reach lands on the other side of the creek was to go west to use Highway 75 and then come back east. This has caused inconvenience and financial hardship. No compensation has been paid for the severance of the road.

It is true that Highway 75 was then (and is now) a good high-speed expressway, and that some persons in the area with easy access to it who formerly used the more direct route to the east are not unduly inconvenienced. However, those living, for instance, south and east of Bellevue, but north of the creek, would, after the taking, have to go first on East Road and enter Bellevue on the eastern edge of the town (East Road being an extension of Hancock Street) by way of a steep grade, and continue north through the town and its business district, in order to obtain access to the road which led out of Bellevue to Highway 75. Only then could he proceed south on Highway 75 to go to La Platte or points beyond. This circuitous route would be miles longer. If he lived just south of Bellevue, it might only be 3–4 miles longer. However, some one who lived or worked just north of the creek and simply wanted to get to lands directly south of the

creek would first have to go north to and through Bellevue, west to Highway 75, south on the highway, then east at La Platte, and north again, just to get over the creek. His extra mileage would go as high as 10.

The destruction of Modification Road as an area through route and as the only way to traverse Papillion Creek east of Highway 75 created additional problems. During rush hours, long waits—sometimes from 15–30 minutes—were encountered before being able to gain entrance to Highway 75 from the access road leading out of Bellevue. The time lost by farmer-businessmen, both because of the extra distance and the nature of the Bellevue-Highway 75 route, resulted in substantial additional expenses. And for farmers moving large pieces of farm equipment and machinery, the route through Bellevue and Highway 75 presented further problems. Entering the town on the west by the steep Hancock Street grade was often difficult. Moving wide equipment through city streets, narrowed by parked cars, with all the incident traffic hazards, was troublesome. Damage was caused by the striking of equipment parts against street curbs, blades being dulled or broken. Police escorts were sometimes necessary. And, after finally gaining access to Highway 75, the special hazards of large, slow-moving farm machinery on a high-speed highway were encountered. Accidents occurred from fast-moving passenger cars running into slow-moving farm equipment. Up to the Base, the highway was at that time a divided four-lane one, but thereafter and proceeding south it narrowed to two lanes. No one could pass a 16-foot-wide cultivator moving on this two-lane portion of the highway. And where the highway crossed Papillion Creek just south of the Base there was a narrow, blind, overpass. It became necessary to have a flag man assist the movement of farm machinery across the overpass. The Modification Road-County Road H–9 route had been an excellent one for the safe movement of such farm equipment.

■ Although, insofar as the governing authority is concerned, public highway easements are not like private property, there being no private gain or advantage involved, the members of the public who use the highways similarly having no proprietary interest in them, nevertheless the appropriate governmental unit, such as a county, having the responsibility of constructing, maintaining or preserving the highways, has a sufficient property interest to maintain an action when one of its highways is taken. Such a taking is within the protection of the Fifth Amendment. Jefferson County, Tennessee v. Tennessee Valley Authority, 146 F.2d 564 (6th Cir. 1945), cert. denied, 324 U.S. 871, 65 S.Ct. 1016, 89 L.Ed. 1425; Wayne County, Kentucky v. United States, 53 Ct.Cl. 417 (1918), aff'd per curiam, 252 U.S. 574, 40 S.Ct. 394, 64 L.Ed. 723 (1920); United States v. Town of Nahant, 153 F. 520 (1st Cir. 1907). Therefore, because of the special nature of the property involved, when a public street or highway is so taken the measure of just compensation is not, in accordance with the usual rule, the fair market value of the land or improvements taken, but is instead the reasonable cost of furnishing necessary substitute facilities. City of Fort Worth, Tex. v. United States, 188 F.2d 217 (5th Cir. 1951); United States v. State of Arkansas, 164 F.2d 943 (8th Cir. 1947); United States v. Los Angeles County, 163 F.2d 124 (9th Cir. 1947); Mayor and City Council of Baltimore v. United States, 147 F.2d 786 (4th Cir. 1945); Jefferson County, Tennessee v. Tennessee Valley Authority, supra. It is a "method of compensation by substitution * * *". Brown v. United States, 263 U.S. 78, 83, 44 S.Ct. 92, 68 L.Ed. 171 (1923).

■■ There is no dispute between the parties concerning these basic legal principles. There is controversy, however, as to their application to the facts of this case. For the rule compels compensation only when the facts of the individual case show that substitute facilities are reasonably "necessary". Lacking such a show-

ing, compensation will be denied. State of California v. United States, 169 F.2d 914 (9th Cir. 1948); United States v. 0.886 of an Acre of Land, etc., 65 F.Supp. 827 (D.C.E.D.N.Y.1946); Jefferson County, Tennessee v. Tennessee Valley Authority, supra. Thus, no compensation is due when reasonable alternate facilities already exist, or satisfactory substitute facilities are provided by the taking authority at the time of or within a reasonable time after the taking. Franklin County, Ga. v. United States, 341 F. 2d 106 (5th Cir. 1965); United States v. Certain Lands, etc., 246 F.2d 823 (3d Cir. 1957); State of Washington v. United States, 214 F.2d 33 (9th Cir. 1954, cert. denied, 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679; United States v. City of New York, 168 F.2d 387 (2d Cir. 1948); United States v. State of Arkansas, 164 F.2d 943 (8th Cir. 1947).

Defendant here admits the taking and the destruction of the Modification Road-County Road H–9 through route as the only direct means east of Highway 75 to traverse Papillion Creek and to connect the bulk of the lands lying on the opposite sides of the creek. It argues, however, that Highway 75 then offered, and still does, a satisfactory, alternate route. Though it may involve extra time and mileage to reach by those living or working well east of it, including the additional mileage involved for those living south of Bellevue who would, in order to go south, first have to go north to Bellevue, and then further north through the town to reach the highway leading to Highway 75, at least some of the lost time would, defendant points out, be made up by the higher traveling speed possible on this main highway. By using the highway and the roads leading from and to it, it would be possible for anyone ultimately to reach every point that could formerly be reached through the more direct Modification Road-County Road H–9 route. The character of Highway 75, its paving and its design, was far superior to Modification Road and County Road H–9.

Furthermore, defendant points to the various improvements that have been made since the taking in 1954 and which have served to reduce some of the problems arising that existed as of the taking date. Around 1957, the section of Highway 75 south of the Base was also converted from a two lane to a four-lane highway. At about the same time, the long delays in entering the highway where the access road leading from Bellevue connected with it were eliminated by the construction of an overpass. Around 1960, a new road, State Road 370, was constructed leading from Bellevue to Highway 75 which was south of, and therefore easier to reach, than the old access road. And in 1962, the steep graded, unimproved entrance into Bellevue on the eastern edge of town (Hancock Street extended) was improved, regraded, and paved with concrete. This improvement, upon which defendant spent $278,000, was designed to serve as an access to the new southeast entrance to the enlarged Base, to which Hancock Street and its extension, East Road, directly led.

■■ However, the substitute facility situation must be viewed as of the taking date, or, at the most, a short time thereafter. State of Washington v. United States, supra. Improvements made many years after the date of taking may not properly be considered. "A condemnation case involves a taking, as of a certain date, and the case is tried with the eyes of the court and jury fastened to the date of taking, and some short but reasonable period before or after the taking." State of Washington v. United States, supra, 214 F.2d at 47. The improvements here relied on are, at least for the most part, too remote from the date of taking. In any event, even considering, in this particular case, the improvements in the situation over the years, on the possible supposition that Congress, in passing the Private Act here involved, so contemplated (although the act [1] and

---

[1]. Public Law 88–425, 88th Congress, 2d Session, 78 Stat. 399, approved August 13, 1964.

its legislative history [2] appear to make clear that only a lifting of the bar of the statute of limitations was intended), they still do not eliminate the basic need of the county for a direct through Bellevue-La Platte route east of Highway 75, and a convenient, timesaving method for those living and working in the area of crossing Papillion Creek in order to reach lands directly on the opposite side of the creek.

■ Ever since at least 1870, Modification Road had provided the county and the residents in this particular area with such a route and creek crossing. Highway 75, even as improved, and all of the other access improvements in recent years, do not solve the circuity and extra time problems. Nor do they solve the problem of the dangers inherent in the throwing of slow-moving farm equipment engaging in essentially local movements onto a high-speed interstate expressway. In a farming, rural, area, a country type of county road is obviously often more suitable for the residents and the conduct of their type of business than a high-speed highway. And this would especially be true where, as here, the county road affords more direct access between various county areas separated by a large stream. Plaintiff has here demonstrated the reasonable need for the reestablishment of a route in the county that will serve its residents as adequately as did Modification Road for such a long period of time. The test is not whether some other existing expressway can somehow handle all the traffic, including the increased traffic generated by the closed road.

\* \* \* it will not at all do to say that in determining the cost of providing any necessary substitutes, an award in condemnation may be denied because there are already in existence other available routes which will in some fashion handle the traffic diverted by the condemnation. City of Fort worth, Tex. v. United States, supra, 188 F.2d at 222.

■ A compensatory taking having occurred, the parties are in further dispute as to what would constitute a proper substitute facility, and what amount, therefore, should fairly be awarded as just compensation. Despite demands therefor, no such substitute has as yet been constructed.

Plaintiff proposes the construction of a new gravel road approximately 1½ miles long which would include a new 220-foot concrete three-span bridge over Papillion Creek. The road would run north-south on section lines almost due south of East Road (Hancock Street extended) and the east gate entrance to the Base. Thus, one could cross the creek, go north and enter Bellevue through the improved East Road-Hancock Street extension, all by traveling in an almost straight north-south line. And going south from Bellevue over such proposed route, there are road connections running west from the southern end of the proposed new bridge to La Platte and Highway 75. This new road and bridge would run approximately 1–2 miles east and southeast of Modification Road-County Road H-9. The new bridge would be approximately 2 miles southeast of the present bridge. The reasonable current cost of building this proposed new road and bridge is $135,560, for which plaintiff sues. As of the taking date, however, such cost would have been only $92,913.

Almost immediately after the severance of Modification Road, plaintiff considered the construction of a different substitute road and retained consulting engineers with respect thereto. This proposed road (sometimes referred to by the parties as "the alternate proposed county replacement road") would have tied into the remaining existing part of Modification Road just north of the present bridge, and would then run due east-west about 7,811 feet, skirting the south boundary of the Base. It would thus provide a method of getting around the Base

2. Senate Report No. 1170, July 2, 1964, 88th Congress, 2d Session; House Report No. 1616, July 28, 1964, 88th Congress, 2d Session.

from the point where the intersected road now terminates at the Base. The new road would end at the same point as the north-south proposed replacement road, so that, from such point, entrance could then also be made to Bellevue on East Road and Hancock Street. No new bridge would be required for this plan, since it would make use of the presently existing bridge. The reasonable cost of this alternate proposal at or shortly after the taking date, as contemporaneously calculated by the consulting engineers, would have been $75,628.[3]

Defendant says that, if substitute facilities are found to be necessary, this east-west road which plaintiff first considered in 1955 would be the closer and more appropriate substitute and compensation should, therefore, be measured by the cost thereof. On this aspect of the case, it seems plain that defendant is correct. It is true that the rule applicable in these cases does not require a "duplicate reproduction" or "the restoration of each feature or form of the facility taken." City of Fort Worth, Tex. v. United States, supra, 188 F.2d at 223. If it is necessary for a county to readjust its highway system by providing a substitute road for one taken, it is entitled to the cost of the substitute even if it be a more expensive road than the one taken. United States v. Des Moines County, 148 F.2d 448 (8th Cir. 1945), cert denied, 326 U.S. 743, 66 S.Ct. 56, 90 L.Ed. 444. Thus, where there is no alternative but to build a substitute that, because of its necessary location and layout, would consequently be a better and more expensive road than the one taken, the county would nevertheless be entitled to the full cost of such substitute. Wayne County, Kentucky v. United States, supra. Similarly, where the old road was inadequate, and present standards dictate the necessity of building a better type of road, the old "status is not controlling", and the condemnor

must shoulder the added expense. United States v. Wheeler Tp., 66 F.2d 977, 985 (8th Cir. 1933).

However, these are not the circumstances here involved. There is no complaint here that the old road and route were inadequate or dangerous. They were lauded throughout this proceeding as having been most satisfactory. The 1955 proposed east-west substitute road would preserve the same traffic pattern as before since it would use the old bridge and the existing part of Modification Road. It would eliminate the necessity for building another bridge. While the new north-south substitute facilities which plaintiff now proposes would generally serve the same people in the area as were served by the old route, it would create quite a different traffic pattern since it would be located so far to the east of the old Modification Road-County Road H–9 route, and would make unnecessary the use of a large part of County Road H–9. The 1955 alternate proposed east-west county replacement road would, obviously, be a more direct substitute. With this replacement, the county's road facilities would be fully equal in utility to those destroyed and the county's residents would be served as adequately and in the same manner as they were previously. The test is what is reasonable under all the circumstances to restore the county to substantially as good a position as it was in prior to the taking, not what the county would prefer to have for long-range planning purposes, or what would be the most desirable improvement. United States v. Alderson, 53 F.Supp. 528 (S.D.W.Va.1944); United States v. 0.886 of an Acre of Land, etc., supra.

Although there are several alleged advantages which plaintiff urges as justification for the construction of the proposed north-south substitute, the principal one appears to be its freedom from railroad crossings. It is true that as of

---

3. Defendant questions the reasonableness of this figure, claiming that the amount allocated therein for obtaining rights-of-way is excessive. For the reasons set forth in finding 26, however, this criticism is rejected.

the taking date, the alternate proposed east-west county replacement road would have involved three railroad crossings at grade.[4] There are no railroad crossings involved in the proposed north-south substitute. However, there is no showing that the crossings in question entail any hazards of a nature more unusual than ordinarily encountered in this type of country road in this area. The previous Modification Road route for the destruction of which this proceeding is instituted also involved two railroad crossings. Cf. United States v. 0.886 of an Acre of Land, etc., supra, at 830 (area involved accustomed to such crossings).[5]

■■■■ Plaintiff points out that $75,628 represents the 1955 cost of building the east-west substitute road but that it would now cost at least $110,600 to build its equivalent. (In the same manner, it seeks the current cost of $135,560 for the proposed north-south substitute with the new bridge, although the 1955 cost would have been only $92,913.) However, in these cases, as is normally the rule in taking cases, the compensation is measured as of the date of the taking. United States v. Certain Lands, etc., supra; United States v. 147.7646 Miles of Roads, Streets and Highways in Aiken, Allendale and Barnwell Counties, South Carolina, etc., 154 F.Supp. 383 (E.D.S.C. 1956). In fixing "just" compensation, it would hardly be fair to impose costs on the taker which have been inflated by the long delay either in constructing the substitute facilities or in bringing an appropriate action.

■■■■ The factor of inflated costs will be at least partially compensated for by the allowance of interest from the date of taking as part of just compensation. This is in accordance with the usual rule in this type of case. United States v. Certain Lands, supra. In the instant case, we feel that the long delay in bringing the action is excused by the fact that the Congress, in its special jurisdictional act referring the case to this court, saw fit to waive "any statute of limitations pertaining to suits against the United States, or any lapse of time, or bars of laches," so that just and equitable compensation, as found by this court, could be paid. (See finding 1.) We hold, as the United States Court of Appeals for the Third Circuit held in United States v. Certain Lands, supra (where there was also a substantial delay between the taking and the trial and where the county had not yet constructed a substitute road), the plaintiff is entitled to interest from the date of taking.[6]

Judgment should be entered for plaintiff in the sum of $75,628, the reasonable cost as of the taking date of constructing the east-west alternate proposed county replacement road,[7] plus interest, as part

---

4. Since the taking date, one crossing has been eliminated.

5. In City of Fort Worth, Tex. v. United States, 188 F.2d 217, 219 (5th Cir. 1951), cited by plaintiff in this connection, the route previous to the taking had an underpass which avoided a grade crossing. The substitute facilities relied on by defendant, however, provided only a grade crossing route. The situation is obviously different.

6. The United States Court of Appeals for the Third Circuit held, 246 F.2d at 826, that "We are persuaded that in the case at bar the Fifth Amendment and the equities require us to allow interest on the compensation awarded the County * * * from the time of taking to the date of the payment. We are convinced that if we do not do so the County * * * would be deprived of just comsation, * * *."

7. Defendant contends that this alternate east-west substitute road could now be built for approximately $40,000 and seeks to limit the judgment to such sum. It points out that, since the taking date, one railroad crossing has been eliminated, and less excavation would now be necessary, as well as other savings made possible, due to drainage work that has since been performed in the area.

However, even if it would be proper, in a case like this, to apply a current cost rule of compensation where a long, unexplained delay is involved and intervening events have served to reduce the taking date costs, nevertheless, for the reasons set forth in finding 26, it seems

of just compensation, at the rate of 4 percent from the date of taking in 1954, the amount to be determined pursuant to Rule 47(c).[8]

---

plain that, properly calculated, such savings made possible by the intervening events would simply result in the total current costs being approximately the same as the 1955 costs. But for these savings, the current costs would, as noted. be $110,600.

8. We are unable to fix the amount of the judgment because the record does not show the exact date of taking.