No. 2-08-0565        Filed: 5-27-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE FOREST PRESERVE DISTRICT OF DU PAGE COUNTY, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 99--ED--54 |
| FIRST NATIONAL BANK OF FRANKLIN PARK, as Trustee under Trust Agreement dated December 17, 1984, a/k/a Trust No. 1056, AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Successor Trustee to North Shore National Bank of Chicago, as Trustee under Trust Agreement dated February 1, 1978, a/k/a Trust No. 87, THE RAINBOW GROUP, ROBERT KRILICH, THE UNITED STATES OF AMERICA, THE CITY OF NAPERVILLE, and UNKNOWN OWNERS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants-Appellants | ) ) | |
| (The State of Illinois ex rel. Lisa Madigan, Attorney General, Intervenor). | ) ) ) ) | Honorable Stephen J. Culliton, Judge, Presiding. |

JUSTICE SCHOSTOK delivered the opinion of the court:

In December 1999, the plaintiff filed this condemnation action against the defendants, seeking to take 204 acres of land in Naperville (the Property). Approximately eight years later, a jury found that just compensation for the taking was $10,725,000, based on the fair market value of the Property in 1999. The defendants appeal, arguing that the trial court erred in: (1) granting summary

judgment in favor of the plaintiff on the issue of whether the plaintiff met its obligation to negotiate in good faith before filing suit; (2) granting the plaintiff's motion in limine to bar certain evidence; and (3) denying the defendants' motion for a posttrial hearing to determine the fair market value of the Property as of December 2007. We affirm in part and reverse in part and remand for further proceedings.

BACKGROUND

In 1978, Naper Venture (in which the defendant Robert Krilich held a dominant interest) applied for the annexation into Naperville of a 456-acre planned unit development (PUD) to be called Country Lakes. The PUD was approved as a special use in connection with the annexation agreement. The PUD application for and the preliminary plat of the Country Lakes PUD designated as open space within the PUD an existing 150-acre public golf course, which was used to satisfy part of the open-space requirements for the PUD. Around the golf course were seven areas that were to be developed as residential areas of varying density. Area 1 was already developed at the time of the annexation agreement. By December 1999, areas 2 through 5 had been developed or were in the process of being developed. Areas 6 and 7 (totaling approximately 54 acres) had not yet been developed, and the Summit Development Corporation had a contract pending to purchase these areas (the Summit parcel) for development.

In November 1999, the plaintiff decided to acquire the Property, which was the 204 acres comprising the golf course and the Summit parcel. It obtained a preliminary engineering report and, based on that, a preliminary estimate of value. The Polach Appraisal Group (Polach) provided a verbal estimate on November 23, 1999, that the Property had a value of $10.3 million. That same day, the plaintiff's board of commissioners approved an ordinance authorizing the plaintiff to

negotiate for ownership of the Property, and the plaintiff's staff issued form letters to the two trusts that they had determined owned the Property. The letters offered the trustees a total of $9.27 million for the Property and gave them 10 working days to respond before the matter would be referred for condemnation proceedings. No appraisal report or other written basis for the amount of the offer was included with the letters. The plaintiff's chief negotiator for the Property later testified in a deposition that it was the plaintiff's policy to make an initial offer that was 10% below the appraised value. If the landowner made a counteroffer, the negotiator could immediately offer the full appraised value, and could go as high as 10% more than the appraised value before having to seek further approval from the plaintiff's board.

On December 3, 1999, the plaintiff received from Polach an updated verbal appraisal in the amount of $11.02 million. The plaintiff's attorneys and staff then met with representatives of the Property's owners to discuss just compensation for the Property. A representative for the Summit Development Corporation was present, and Summit's pending contract to purchase areas 6 and 7 was distributed and discussed. The owners rejected the plaintiff's initial offer but did not make a counteroffer. After the meeting, the plaintiff received from Polach its first written appraisal of the Property's value, which reflected the verbal estimate of $11.02 million.

Under the plaintiff's acquisition policy, it sought two appraisals on any piece of property it wished to acquire: an initial estimate by one certified appraiser, and a report by a second certified appraiser who reviewed the first estimate and gave his own estimate and the reasons for any difference between the two. The second appraiser for the Property was David W. Phillips. Phillips reviewed the Polach appraisal and, on December 6, 1999, faxed a one-page document to the plaintiff. Phillips stated that, although he concurred with the Polach appraisal of certain parcels, he disagreed

on other parcels and believed that Polach's estimate of $11.02 million for the Property was too high. Phillips' estimate for the Property was $8.995 million.

On December 7, 1999, the plaintiff's board of commissioners met and considered the negotiations for the Property. Both the Polach and the Phillips appraisals were before them, as was a log of all of the communications in connection with the negotiations. Neither side had made any further offers or counteroffers since the November 23 offer letters. Krilich (the majority beneficiary under both trusts) had expressly rejected the initial offer. The board of commissioners adopted an ordinance finding an inability to agree, revoking authority to negotiate further, and authorizing condemnation of the Property. The plaintiff sent letters to the two trustees and Summit Development Corporation enclosing a copy of the December 7 ordinance.

On December 21, 1999, the plaintiff filed a complaint for condemnation. At the time the complaint was filed, the ownership of the Property was disputed and separate litigation to determine the ownership was ongoing. Proceedings in this case were stayed until the ownership suit was resolved in October 2001. A further delay arose when Krilich and Edward White, two of the beneficiaries of the trusts that owned the Property, began to dispute among themselves who had the right to control the defense in the condemnation action. That dispute was not resolved until November 2004.

In March 2005, the defendants filed a second amended traverse and a motion to dismiss, arguing that the trial court lacked jurisdiction and that the condemnation complaint should be dismissed for several reasons. The parties conducted discovery on the issues raised in the traverse. In September 2006, the plaintiff filed four motions for partial summary judgment, each motion addressing an issue raised in the traverse. One of the plaintiff's motions concerned whether the

plaintiff had engaged in good-faith negotiations prior to filing the condemnation complaint. On December 4, 2006, the trial court granted all four motions and entered summary judgment in the plaintiff's favor on those issues.

On August 3, 2007, the defendants filed a motion asking the trial court to schedule a posttrial evidentiary hearing pursuant to Kirby Forest Industries, Inc. v. United States, 467 U.S. 1, 81 L. Ed. 2d 1, 104 S. Ct. 2187 (1984) (a Kirby hearing), on the value of the Property as of the time of trial. On October 18, 2007, the plaintiff filed several motions in limine. The first of these motions (motion in limine No. 1) sought to bar the defendants from presenting any evidence at trial regarding the value of the Property if the defendants were able to develop residential units on the 150 acres then being used as a golf course. Following briefing, on November 13, 2007, the trial court heard oral argument on the Kirby motion and motion in limine No. 1. At the close of the hearing, the trial court denied the motion for a Kirby hearing. The trial court issued its ruling on motion in limine No. 1 on November 20, 2007. In that ruling, the trial court found that the only use permitted for the golf course under the PUD preliminary plat was as a golf course, that no residential uses had ever been contemplated by the parties or approved by the City of Naperville, and that the defendants therefore could not present valuation evidence based on the assumption that the golf course could be developed, as of right, with residential units. The trial court therefore granted motion in limine No. 1.

The case proceeded to a jury trial on December 12, 2007. After the close of evidence, the defendants made an offer of proof to the effect that, if they had been permitted to present evidence regarding the value of the Property if the golf course were developed with residential units, the evidence would have shown a value of up to $20 million. The jury determined that the fair market

value of the Property on December 21, 1999 (the date the condemnation complaint was filed), was $10.7 million. The defendants filed a motion for a new trial, which the trial court denied. This appeal followed.

ANALYSIS

On appeal, the defendants raise three arguments. First, they argue that the trial court erred in granting the plaintiff summary judgment on the issue of whether the plaintiff engaged in good-faith negotiations prior to filing the condemnation complaint. Second, they argue that the trial court erred in granting motion in limine No. 1, and that they are entitled to a new trial as a result. Finally, they contend that the trial court erred in denying their motion for a posttrial Kirby hearing.

I. GOOD-FAITH NEGOTIATION

In their second amended traverse, the defendants asserted that the condemnation complaint should be dismissed because the plaintiff did not negotiate in good faith before filing the complaint. After discovery on the issues raised in the traverse, the plaintiff filed a motion for summary judgment on this issue. The plaintiff attached to its motion copies of the appraisals it received from Polach and Phillips, and a transcript of the deposition of its employee Janice Roehll, who had primary responsibility for conducting the negotiations for the Property. In their response, the defendants argued that the plaintiff's exhibits could not be considered, because the appraisals were inadmissible hearsay and Ms. Roehll's deposition had not been properly certified. They also argued that, even if Ms. Roehll's testimony were taken into account, certain aspects of the plaintiff's offer--the failure to include an appraisal with the offer letters, the limitation of the negotiation period to 10 days, and, above all, the failure to offer the defendants the full amount of the Polach valuation of the Property--created genuine factual issues relating to the good faith of the negotiations. The

defendants did not support their response with any affidavits or other evidence.  In its reply, the plaintiff argued that the Polach and Phillips appraisals were not hearsay because they were not offered to establish the truth of their contents, that is, what the Property was worth; instead, they were verbal acts, relevant to show the information upon which the plaintiff relied in making its offer for the Property.  The plaintiff also pointed out that its offer exceeded one of the valuations it received, that the offer was rejected by the defendants and the defendants never made any counteroffer, and that a substantial gap existed between the parties' estimations of the Property's value, thereby establishing an impasse as a matter of law.

At the hearing on the motion for partial summary judgment, the parties stipulated that the plaintiff had sent the two offer letters to the trusts listed as owners of the Property, offering a total of $9.27 million for the Property.  The trial court found that this offer was "supported by a bona fide appraisal."  The trial court also found, after questioning the parties regarding the evidence submitted in connection with the briefs, that it was undisputed that the defendants did not accept the offer and did not obtain their own appraisal of the Property prior to the close of negotiations.  The defendants admitted that none of them had made any counteroffer to the plaintiff; the only counterproposal received by the plaintiff (suggesting a cutback in the amount of property to be taken) came from Summit Development Corporation, which was not an owner of the Property.  The trial court also found that the Polach and Phillips appraisals were admissible, not as evidence of the actual value of the Property, but as evidence of the information that was before the plaintiff's board when it decided to terminate negotiations, as supported by Ms. Roehll's testimony.  The trial court then granted summary judgment in the plaintiff's favor on the issue of whether the plaintiff negotiated in good faith before proceeding with condemnation.

On appeal, the defendants attack the grant of summary judgment on a number of bases, none of which have merit. We review the grant of summary judgment de novo. Ioerger v. Halverson Construction Co., 232 Ill. 2d 196, 201 (2008).

The statute governing condemnation at the time of the negotiations at issue, the 1998 Eminent Domain Act (Act) (735 ILCS 5/7--101 et seq. (West 1998)), provided that a governmental body may exercise the power of eminent domain through a condemnation proceeding only where, among other things, "the compensation to be paid for or in respect of the property sought to be appropriated *** cannot be agreed upon by the parties interested." 735 ILCS 5/7--102 (West 1998). Our supreme court has held that, as part of the requirement that the parties cannot agree on the compensation due, "good-faith negotiations with the landowner are a condition precedent to condemnation proceedings under the Eminent Domain Act." Department of Transportation v. 151 Interstate Road Corp., 209 Ill. 2d 471, 480 (2004).

The primary argument raised by the defendants is that, as a matter of law, in order for a court to find that a governmental agency negotiated in good faith, the agency must show that it made an offer that was equal to the appraised value of the property sought to be taken. In support, the defendants cite to City of Naperville v. Old Second National Bank of Aurora, 327 Ill. App. 3d 734 (2002). In that case, the city offered the property owners less than half of the appraised value (as determined by its own appraisers) for the property, and, although the city eventually increased its offer, the highest offer was still below the appraised value. We found that these low offers did not meet the good-faith requirement. In doing so, we canvassed Illinois case law on the extent to which a finding of good faith requires an offer equal to the acquiring body's own appraisal of the property's worth. We commented:

"In cases where Illinois courts have found that the condemning authority had satisfied its statutory obligation to make a bona fide attempt to agree, the condemning authorities offered to purchase the properties for their appraised value. [Citations.] Indeed, our research has uncovered only one case in which the condemning authority failed to offer the appraised value, and in that case the court found that the condemning authority had failed to negotiate in good faith. [Citation.] Although we are aware of no legal requirement that the condemning authority must offer the appraised value of the property in order to satisfy the negotiation requirements of section 7--102 [of the Act (735 ILCS 5/7--102 (West 1998))], we nonetheless believe that good faith requires that the condemning authority offer a price that correlates to the fair market value of the property as determined by the condemning authority." City of Naperville, 327 Ill. App. 3d at 741.

The intervening years since City of Naperville was decided have not given us any reason to reject its reasoning. Indeed, that case has since been followed by at least one other district of the appellate court. See City of Chicago v. Zappani, 376 Ill. App. 3d 927, 934 (2007) (where city made only a single offer of 60% or less of the properties' values as determined at trial, city did not show good-faith negotiations).

Nevertheless, those cases do not dictate the outcome here, for the simple reason that in this case the plaintiff's offer was more than the appraised value offered by one of its appraisers, Phillips. The plaintiff offered $9.27 million; Phillips valued the Property at $8.995 million. Thus, although the plaintiff's offer was less than the valuation it received from Polach, which was initially $10.3 million and then increased to $11.02 million, it was still $275,000 more than the valuation it received from Phillips. Under these circumstances, the cases cited by the defendants have no application.

The plaintiff's decision to offer the defendants an amount that was slightly less than the first valuation it received but more than the second valuation (which it received prior to its decision to commence condemnation proceedings) is not comparable to the egregious behavior present in City of Naperville, in which the city offered less than half of its own appraised value for the property, and Zappani, in which the city offered between 45% and 60% of the appraised value of the parcels it sought. We hold that, in these circumstances, the plaintiff was not required to immediately offer the full amount of the highest appraisal it received, and its failure to do so does not show a lack of good faith in its negotiations.

The defendants also argue that the plaintiff's appraisers failed to take into account the Summit parcel's contract price and that this failure violated accepted professional standards for the appraisal industry. They have forfeited this argument, however, because they did not raise it before the trial court. A reviewing court will not consider arguments not presented to the trial court. In re County Treasurer & ex officio County Collector, 373 Ill. App. 3d 679, 702 (2007). The defendants suggest that they did not forfeit this argument, because it was part of the general issue of "good faith attempt to agree" that they raised in the trial court. This suggestion is simply wrong: although the defendants criticized the failure to include an appraisal with the offer letters, the limitation of the negotiation period to 10 days, and the failure to offer the defendants the full amount of the Polach valuation of the Property, they never attacked either the Polach or the Phillips valuation as being too low because those appraisers used invalid appraisal methods. Had the defendants raised this argument in the trial court, the parties could have conducted discovery on it, argued it orally, and created a record that would aid this court in resolving the issue. Because they failed to do so, we hold that they have forfeited the opportunity to raise the argument on appeal.

The defendants offer two other arguments related to good faith: they argue that the plaintiff's lack of good faith is shown by its failure to attach an appraisal to its offer letters and by its 10-day limit on the negotiation period. As the plaintiff points out, however, neither of these actions violated any requirement placed on condemning bodies. Under section 7--102.1 of the Act, the condemning body's offer letter to the landowner must include "[t]he amount of compensation for the taking of the property proposed by the agency, and the basis for computing it." 735 ILCS 5/7--102.1(d)(1) (West 1998). No Illinois court has held that including "the basis for computing" the amount of compensation means that the condemning body must unilaterally tender its own appraisal to the landowner. Similarly, a condemning body need not offer more than 10 days for negotiations. No Illinois court has imposed such a requirement, and we are aware of at least two cases in which the offer letter set a 10-day period for negotiations and the court found that the condemning body made a good-faith attempt to agree on compensation. See County Board of School Trustees v. Batchelder, 7 Ill. 2d 178, 180-82 (1955); Illinois State Toll Highway Authority v. Karn, 9 Ill. App. 3d 784, 791 (1973). As the plaintiff was not required by law to either attach the appraisal to its offer letter or allow more than 10 days for negotiations, we cannot find that its failure to do so indicates a lack of good faith. Perhaps we would reach a different result if the defendants had asked to see the basis for the plaintiff's offer, or asked for more time to negotiate, and the plaintiff had unreasonably refused. The record does not disclose any such requests, however.

Finally, in their reply brief, the defendants argue that the appraisals that the plaintiff attached to its motion for partial summary judgment were inadmissible hearsay, and they argue that without those exhibits there was no basis for summary judgment. The defendants have forfeited this argument through their failure to raise it in their opening brief. 210 Ill. 2d R. 341(h)(7); Kirkpatrick

v. Strosberg, 385 Ill. App. 3d 119, 127 (2008). Even if this argument were not forfeited, it would be unsuccessful, as the Polach and Phillips appraisals were not hearsay--they were not offered for the truth of their contents (see People v. Kliner, 185 Ill. 2d 81, 150 (1998))--and an adequate foundation for their admissibility was laid by Ms. Roehll in her deposition testimony. The trial court did not err in granting summary judgment in the plaintiff's favor on the issue of whether the plaintiff made a good-faith attempt to agree on compensation before commencing the condemnation proceedings.

PLAINTIFF'S MOTION IN LIMINE No. 1

Before trial, the plaintiff moved to bar any testimony stating the legal opinion that the defendants were entitled to develop residential units on the golf course portion of the Property and to bar any evidence relating to valuations of the Property based on such a legal opinion. The plaintiff argued that the preliminary plat of the PUD governed the defendants' use of the golf course and required that the golf course continue to be used as such; that any reduction in the open space provided by the golf course would be a "major change" that would require approval by the city council under the Naperville zoning ordinance; and that the defendants therefore could not develop, as of right, residential units on the golf course. The plaintiff sought to bar any contrary testimony as unsupported by the law or the evidence.

The defendants premised their counterarguments on the expiration of the annexation agreement that the parties entered into at the same time that the preliminary plat for the PUD was approved. Specifically, the defendants contended that under this court's decision in Bank of Waukegan v. Village of Vernon Hills, 254 Ill. App. 3d 24 (1993), the special uses and zoning established by the PUD documents expired at the same time as the annexation agreement, with the

result that the golf course reverted to the underlying zoning under the Naperville zoning ordinance, namely R-4. Thus, they argued, they could build as of right multifamily residences on the golf course, and their expert witnesses were entitled to testify to the value of the Property if it were developed in this way. Because this is a purely legal issue centering on statutory interpretation, we review de novo the trial court's decision to grant motion in limine No. 1. Avery v. State Farm Mutual Automobile Insurance Co., 216 Ill. 2d 100, 129 (2005).

We begin with a brief review of the history of the Country Lakes PUD. In February 1978, Naper Venture (the developer) filed an application for a PUD on land including the Property. The application stated that the required park donation would be met by "the permanent maintenance of a 145 acre, 18-hole golf course." The city of Naperville annexed the Property and other land under the terms of an annexation agreement dated June 19, 1978, and signed by the landowners (the Agreement). The Agreement recited that the parties wished to develop as a PUD the land being annexed. The city agreed to adopt an ordinance approving a preliminary plat for the PUD, and the landowners agreed that the land would be developed in accordance with that preliminary plat. The golf course was specifically mentioned: the city agreed that the developer would receive credit for its required park contribution under the specified formula, and the developer agreed that the golf course would remain available to residents of the PUD for use as a golf course and that if the developer or its successors abandoned the golf course, the golf course would be dedicated to the city without cost. The Agreement also addressed the effect of upcoming amendments to the Naperville zoning ordinance, stating: "it is understood and agreed upon by the parties hereto that the CITY is in the process of adopting a new comprehensive Zoning Ordinance, and the terms and conditions of same, upon its adoption, shall apply to the Subject Premises so long as said terms and conditions

shall not modify the Planned Unit Development as adopted hereby." Finally, the Agreement contained a survival clause, which provided as follows:

"This Annexation Agreement shall be binding upon and inure to the benefit of the parties hereto, successor owners of record of land which is the subject of this Agreement, assignees, lessees and upon any successor municipal authorities of said CITY and successor municipalities for a period of ten (10) years from the date of execution hereof, and any extended time that may be agreed to by amendments, with the understanding that the zoning and P.U.D. Special Use Designations granted hereby shall survive the expiration of this Agreement, unless changed as provided in paragraph 6." (Emphasis added.)

At the same time that the parties entered into the Agreement, the city of Naperville adopted ordinance 78--68, approving the preliminary plat for the Country Lakes PUD. The preliminary plat designated the golf course portion of the Property as a golf course and did not show any residences on it.

In 1980, the city of Naperville enacted a comprehensive zoning ordinance. Section 6--4--6 of the ordinance provides that a PUD "shall be constructed in accordance with the approved preliminary or final plat" of the PUD, and that "[t]hese plats shall control and limit the use of the parcel of land *** and the location of buildings and structures in the planned unit development as indicated on the plats." Naperville Municipal Code §6--4--6 (1980). Under that section, a proposed reduction in open-space acreage is a "major change" that requires the filing of a revised preliminary plat and supporting data, and the action and approval of the zoning administrator, plan commission, and city council. Naperville Municipal Code §6--4--6 (1980). Section 6--4--8, titled "Effective Period of Planned Unit Development," provides that, under certain conditions, a PUD may be

revoked by the city council, but it provides no other manner of termination or expiration of a PUD. Naperville Municipal Code §6--4--8 (1980). Under the ordinance, if the Country Lakes PUD ceased to exist, the underlying zoning for the golf course portion of the PUD would be R-4.

It is undisputed that the Agreement expired in 1988, 10 years after it was signed. The parties dispute, however, whether the PUD special use designations and zoning survived the expiration of the Agreement. The plaintiff argues that the parties intended that the golf course would be used as a golf course permanently and that this intention is reflected in the above-cited provisions of the Agreement, including the survival provision. The defendants argue that, under our decision in Bank of Waukegan, the survival provision is not enforceable because it violates Illinois law, while the plaintiff argues that Illinois law does not forbid such survival provisions. We conclude that the plaintiff's view of Illinois law is correct.

The parties' dispute centers on the scope of our decision in Bank of Waukegan. In that case, the village of Vernon Hills and some landowners had entered into an annexation agreement and a related PUD in 1971. The term of the annexation agreement was initially 5 years, but it was extended by agreement when the Illinois Municipal Code (Municipal Code) (Ill. Rev. Stat. 1975, ch. 24, par. 11--15.1--5) was amended to permit annexation agreements to continue for 10 years before expiration. Bank of Waukegan, 254 Ill. App. 3d at 25. Although the agreement was amended to incorporate a new development plan, there was no effort to extend the plan beyond the statutory expiration date in 1981. After the expiration of the agreement, the village adopted zoning code revisions that changed the zoning of the parcel. In 1986, developers purchased the parcel and sought to construct apartments on it. They argued that the previous PUD (which permitted multifamily residences on the parcel) did not expire when the annexation agreement expired. We held that the

developers could not enforce the previous zoning of the parcel after the expiration of the agreement. Bank of Waukegan, 254 Ill. App. 3d at 28. We noted that section 11--15.1--1 of the Municipal Code (Ill. Rev. Stat. 1981, ch. 24, par. 11--15.1--5) provided that annexation agreements expired no more than 10 years after they were executed. We found that the PUD zoning and special use permits at issue were created by the annexation agreement and were an integral part of that agreement. In light of the statutory intent that such agreements expire within 10 years, we held that the PUD zoning and special use permits could not survive the expiration of the agreement. Bank of Waukegan, 254 Ill. App. 3d at 28.

At first blush, Bank of Waukegan would appear to dictate that the zoning and use restrictions at issue here expired in 1988, when the Agreement expired. However, the plaintiff argues that Bank of Waukegan is distinguishable on its facts, because that case involved an annexation agreement that contained no survival provision, unlike the Agreement here, which has such a provision. Indeed, argues the plaintiff, if there had been a similar survival provision in the annexation agreement in Bank of Waukegan, that case would never have arisen, because such provisions were common in annexation agreements and there was no dispute as to their enforceability.

The recitation of facts in Bank of Waukegan does not explicitly state that the annexation agreement at issue had no survival provision. However, Illinois law at the time supports the plaintiff's interpretation. In 1993, section 11--15.1--2(b) of the Municipal Code expressly permitted annexation agreements to include language providing for "[t]he continuation in effect *** of any ordinance relating to subdivision controls, zoning, official plan, and building, housing and related restrictions," so long as the ordinance had been properly enacted following a public hearing. 65 ILCS 5/11--15.1--2(b) (West 1992). If the Bank of Waukegan annexation agreement had such a

survival provision, there would have been no need to determine whether the zoning established in the agreement survived the expiration of the agreement. Thus, although Bank of Waukegan does not spell out that it is addressing the situation in which an annexation agreement does not contain a survival provision, we believe that a proper reading of that decision in its historical context makes that inference clear. We therefore hold that Bank of Waukegan applies to only those circumstances and does not control where, as here, the annexation agreement contains a survival provision.

Section 11--15.1--2(b) of the Municipal Code (65 ILCS 5/11--15.1--2(b) (West 2008)) remains in effect through the present time, unchanged from its 1992 version. Its plain language permits the inclusion of survival provisions in annexation agreements, such as the one in the Agreement here. Thus, such survival provisions cannot be contrary to Illinois law, as the defendants argue. The defendants have not put forward any other reason why the survival provision in the Agreement, when read with the preliminary plat and the applicable zoning ordinance, would not operate to prevent developing residences on the golf course. Accordingly, the trial court did not err in granting motion in limine No. 1 or in denying the defendants' motion for a new trial based on this issue.

JUST COMPENSATION AND THE DENIAL OF THE KIRBY HEARING

The defendants' final argument on appeal is that they were denied just compensation for the Property by the trial court's refusal to hold a posttrial evidentiary hearing pursuant to Kirby, 467 U.S. at 18, 81 L. Ed. 2d at 16, 104 S. Ct. at 2198, to determine the value of the Property as of December 2007. Under section 7--121 of the Act as it existed prior to January 1, 2007 (735 ILCS 5/7--121 (West 1998)), the value of condemned property was to be determined as of the date on which the condemnation action was filed (in this case, December 1999). Prior to trial, the defendants moved

to schedule a posttrial hearing on the value of the property as of December 2007, arguing that Kirby required such a hearing and that they would be denied just compensation if they were paid only the value of the Property in 1999 instead of its value at the time of trial. Noting that no Illinois court had ever applied Kirby, the trial court denied the motion. The case proceeded to trial on the sole issue of the Property's value in December 1999, and the jury fixed that value at approximately $10.7 million. The defendants then filed a posttrial motion in which they argued (among other things) that this verdict denied them just compensation because it did not account for the rise in the Property's value during the eight years that the case was pending before trial. In support, the defendants attached as an exhibit an appraisal stating that, as of December 2007, the Property was worth a minimum of $25.5 million (assuming that the golf course continued to be used as such and no residences were built on it). The trial court denied the posttrial motion.

The defendants' appeal of these rulings raises several issues. First, what measure of compensation for the taking of property constitutes "just compensation" under the fifth amendment? Second, were the defendants denied just compensation in this case? Third, if the defendants were denied just compensation, was this the result of their own choices or actions such that the denial does not offend the constitution? In addition, we asked the parties to submit supplemental briefs on two other issues: are the recent amendments to the Act applicable in this case, and, if they are not, is the old version of the statute constitutional as applied? After we issued this order, the defendants served a notice pursuant to Supreme Court Rule 19 (210 Ill. 2d R. 19) on the Attorney General, stating that they were challenging the constitutionality of section 7--121 of the Act as applied in this case. The Attorney General then sought and was granted leave to intervene in this appeal, and she filed a brief relating to the supplemental issues. As there are no factual disputes associated with any of these

questions and they are purely legal issues, our review of them is <u>de novo</u>. <u>People v. Brown</u>, 225 Ill. 2d 188, 198 (2007). We begin our analysis with the development of Illinois just-compensation law and the more recent expression of just-compensation law by the United States Supreme Court.

### A. The Measure of Just Compensation

### 1. The Illinois Date-of-Filing Rule

As the Illinois Supreme Court stated in <u>Sanitary District of Chicago v. Chapin</u>, 226 Ill. 499, 503 (1907):

"The provision of the constitution that private property shall not be taken for public use without just compensation requires that the owner shall receive the market value of his property at the time of the taking, and as to this proposition the courts are agreed. [Citation.] There is, however, a great diversity of opinion as to <u>when</u> the property is taken, in legal contemplation, for the public use." (Emphasis added.)

The court noted that some commentators argued that the taking occurred on the date when the acquisition of particular property was first authorized through the enactment of a statute or ordinance, while others argued that the taking did not occur until the condemnation action was actually filed (which might be some time later) or the condemnation trial commenced. In <u>Cook v. South Park Commissioners</u>, 61 Ill. 115 (1871), the first reported Illinois case to have considered what date to use in determining the value of the property, the trial court had excluded all evidence of the value of the property after the date on which the legislature authorized the defendants to acquire the property for use as a park. The supreme court rejected this approach, holding that, under the Illinois Constitution, a taking required not merely legislative authorization but also the actual acquisition of the property. In the event that the parties did not reach an agreement, the acquisition

in turn required a judgment rendered after a judicial proceeding. Thus, the appropriate date of valuation was the "date of condemnation," which "would approximate more nearly to right and justice, and to the time when the land is actually taken, as contemplated by the law." Cook, 61 Ill. at 123. Further, the trial court had instructed the jury that the landowner was chargeable for rent during the time between the legislative authorization of the taking and the commencement of the condemnation trial. This, too, was error, as the defendants had "neither right nor title" to the property prior to the condemnation proceeding. Cook, 61 Ill. at 123. Rather, "[t]he absolute title to the land, and the right to enter upon and use it, *** await[ed] the payment of the compensation," once that had been fixed through a condemnation trial. Cook, 61 Ill. at 125.

In South Park Commissioners v. Dunlevy, 91 Ill. 49, 53 (1878), the supreme court adopted the rule that the value of the property taken in a condemnation proceeding should be determined as of the date on which the government filed the condemnation complaint. Although the court stated that "[t]he filing of a petition to condemn property is not a taking of the same," it nonetheless held that the date of filing should be used as the date of the property's valuation because it afforded certainty, and otherwise delays in litigation that were beyond anyone's control could result in the condemning body being "compelled" to acquire the property at a price higher than it had planned for. Dunlevy, 91 Ill. at 52, 54. (The court does not appear to have considered the possibility that, in that event, the condemning body could abandon the taking.) By 1907, the supreme court commented that the rule was "firmly established" that the value of property taken pursuant to condemnation was to be determined as of the date on which the condemnation petition was filed. Chapin, 226 Ill. at 504; see also Trustees of Schools of Township No. 37 v. First National Bank of Blue Island, 49 Ill. 2d

408, 411 (1971). Generally speaking, this rule has been applied in condemnation cases ever since, even when there was evidence of a substantial change in the value of the property.

The rule has not been without its critics, and the Illinois Supreme Court has on occasion declined to apply it. Justice Orrin Carter lodged one such protest in his dissent in <u>City of Chicago v. Farwell</u>, 286 Ill. 415, 426 (1918) (Carter, J., dissenting). There, the trial court had refused to permit the defendant to introduce evidence of the property's value at the time of trial, which was two years after the condemnation action commenced. A majority of the supreme court affirmed, stating that "in this state that question has passed beyond the stage of discussion and has become a fixed rule" requiring the use of the date of filing as the date of valuation. <u>Farwell</u>, 286 Ill. at 417. In dissent, Justice Carter criticized this inflexible application of the rule, saying:

"In an ordinary case, which is quickly disposed of, the time of filing the petition will generally give a fair value as to the interests of all parties, yet to enforce that rule arbitrarily in all cases, even when years have elapsed between the filing of the petition and the time of the hearing to fix the value, will result in great wrong and injustice. ***

*** In my judgment it is entirely practicable, in an exceptional case of this kind, to fix the date of the beginning of the trial before the jury *** as the date at which the value of the property should be fixed. While such a date may not do exact justice, it will approximately come nearer doing so in cases of this kind than it will to follow an arbitrary rule by fixing the time as of the filing of the petition ***." <u>Farwell</u>, 286 Ill. at 430-32 (Carter, J., dissenting).

Justice Carter noted that the supreme court had previously declined to apply the rule in two cases, <u>Chapin</u>, 226 Ill. 499, and <u>Moll v. Sanitary District of Chicago</u>, 228 Ill. 633 (1907). <u>Chapin</u>

is of particular relevance here, because the supreme court later drew upon it in enunciating the exceptions to the rule. In Chapin, the court upheld the trial court's dismissal of the condemnation action for want of prosecution where the plaintiff sanitary district did not serve the defendant landowner until over four years after the suit was filed. The land had appreciated substantially in the meantime. The court acknowledged the rule requiring the use of the date of filing as the date of valuation, but went on to state that, "if it should be applied to a case like this, where the owner has not been brought into court and no steps have been taken for several years, during which the property has greatly advanced in value, it would result in wrong and injustice." Chapin, 226 Ill. at 504. Therefore, it was "manifest either that the court was right in [dismissing] the petition or that the settled rule that property is to be regarded as taken when the petition is filed should not be applied to a case like this." Chapin, 226 Ill. at 505. The dismissal of the case would require the district to refile its action if it still wished to acquire the property, which in turn would set a new, more recent "date of filing" to act as the date of valuation. Thus, the landowner would not be penalized by the government's own delay in serving him.

In Illinois Cities Water Co. v. City of Mt. Vernon, 11 Ill. 2d 547 (1957), the supreme court explicitly departed from the traditional rule (rather than simply dismissing the case). The court held that the rule could be varied where it would work an injustice, because it was merely a judicially created rule, which must yield to the constitutional requirement that a landowner be paid just compensation, that is, an amount sufficient to make the landowner whole at the time the transfer occurred. City of Mt. Vernon, 11 Ill. 2d at 552. In that case, the landowner was a water company that made capital improvements to its property even after the condemnation complaint was filed. The improvements were required by regulations, and the water company had no choice but to make

them. The court permitted the landowner to introduce evidence of increases in value after the date on which the complaint was filed, because, under the circumstances of the case:

"[T]he ordinary rules of valuation must *** change so as to put the appellee in as good a financial condition after the transfer as it was before. Nothing short of such an amount conforms to the constitutional requirement of just compensation." City of Mt. Vernon, 11 Ill. 2d at 552.

In 1972, the rule setting the date of valuation as the date of filing was codified as section 9.7 of the Act (Ill. Rev. Stat. 1973, ch. 47, par. 9.7), and it has remained part of either the Act or the Municipal Code since that time. The Illinois Supreme Court last addressed the validity of the rule in 1971 (prior to its codification), in Blue Island, 49 Ill. 2d at 411. In Blue Island, the landowner argued that delays in the condemnation proceeding had deprived him of just compensation, because there was a substantial increase in the value of the land between the date on which the condemnation complaint was filed and the date on which judgment was entered. The supreme court stated that remedies for this problem existed, through either an award of damages or a dismissal of the suit. However, these remedies were available only if the delay could be laid at the feet of the condemning authority and was not equally (or more) the fault of the landowner: " 'The defendant who stands by and makes no effort to bring his cause to trial should be considered as waiving damages caused by the delay.' " Blue Island, 49 Ill. 2d at 411, quoting Winkelman v. City of Chicago, 213 Ill. 360, 364 (1904).

The primary foundation for this "fault-based" approach to just compensation is a suit that did not directly involve just compensation at all. In Winkelman, 213 Ill. 360, a landowner sued the city of Chicago for damages after the city filed a condemnation suit to take his land and then, after

judgment was rendered, abandoned the taking. (The suit was filed in 1890, the judgment was entered in 1896, and the city decided to abandon the taking 15 months later.) As the city did not end up taking the land, the suit did not seek just compensation for the value of the land. Rather, the owner sought to recover the attorney fees and costs incurred in defending against the condemnation action and sought damages for the decrease in the property's value in the intervening years. The owner presented evidence that the local circuit court had delegated control over the condemnation trial docket to the city and that he applied repeatedly but without success to have the case set for trial. He also presented evidence that he could have sold the property at a higher price if the city had not filed and then unreasonably delayed the condemnation proceeding, but the trial court ordered this evidence stricken. The trial court ordered the jury to award the owner only his fees and costs, not the damages he sought, and he appealed. The Illinois Supreme Court held:

"When a municipal corporation institutes a proceeding to condemn land, it should prosecute the suit with diligence. *** If it wrongfully delays the trial of the cause, and omits to make its election to take the land or abandon the proceeding within a reasonable time after the amount of the judgment has been fixed, and then elects to discontinue, it is liable to the owner of the land for damages occasioned by such wrongful acts." Winkelman, 213 Ill. at 363.

The damages available included the decrease in the value of the property. In keeping with the tort-like nature of the action, the court emphasized that such damages were available only where the delay not only caused harm but was "wrongful." Winkelman, 213 Ill. at 363.

The city argued that the landowner had forfeited his claim because he did not seek to have the action placed on the trial calendar. The court agreed that this would ordinarily be a valid defense

to such a claim. Winkelman, 213 Ill. at 364. However, because the city itself controlled the trial docket, it was estopped from raising this defense. Winkelman, 213 Ill. at 365.

In Blue Island, the supreme court drew on Winkelman and Chapin as support for a rule that the property being taken must be valued as of the date of filing unless the government is at fault in causing a substantial delay, during which the value of the property rises substantially. Only if the government is wholly at fault may the landowner obtain relief, by moving to dismiss the suit so that the government must refile it (thereby establishing a new date of valuation). Blue Island, 49 Ill. 2d at 411.

The fault-based exception enunciated in Blue Island was not included in the codification of the date-of-filing rule of valuation.[1] Nonetheless, the parties agree that, at the time this suit was filed, it was the law of Illinois: under section 7--121 the jury must use the date of filing as the date of valuation, but if the landowner can point to substantial delay in the case that he neither caused nor acquiesced to, he can obtain damages or dismissal of the condemnation action.

---

[1]The Act does not contain any fault-based exception to applying section 7--121 in order to allow for a date of valuation other than the date of filing, nor does it refer in any way to the issue of delays in a condemnation case, or the role of fault in those delays. Section 7--111 (735 ILCS 5/7--111 (West 1998)) represents a partial codification of Winkelman, providing that upon the dismissal or unsuccessful termination of a condemnation case, the trial court may make "such provision as is just" for damages arising from the condemnation proceedings, and for costs, expenses and attorney fees. However, neither it nor section 7--123 (735 ILCS 5/7--123 (West 1998)) (a companion section dealing with the taxing of attorney fees and costs) conditions such payment on the condemnor's fault, or on the landowner's lack of fault.

2. Kirby

Thirteen years after Blue Island, in 1984, the United States Supreme Court decided Kirby. In Kirby, the government sought to take a parcel of timber company land for a forest preserve. The condemnation trial was held in March 1979. However, the parties both filed objections to the result, and it was not until March 1982 that the matters were settled and the government deposited the money for the property. The landowner argued that it should receive three years of interest on the award because of the delay between the trial and the time that it actually received the money. The district court awarded interest, but the appellate court vacated that ruling on the ground that the "taking" did not occur until the government deposited the money, and thus no interest was due. The case then went to the Supreme Court.

The Supreme Court first considered the issue of when the taking occurred. It held that, because the federal government retains its right to decide not to acquire land even after a trial setting the amount of just compensation, the "date of taking" is the date on which the government actually pays the owner and takes title to the land. Kirby, 467 U.S. at 12, 81 L. Ed. 2d at 12, 104 S. Ct. at 2195. Thus, the "taking" in Kirby occurred in 1982 when the government deposited the money and took title to the land, not in 1979 when the condemnation trial was held, and so no interest was due for the three-year period.

The Court then examined whether the landowner had received just compensation for its property. In federal condemnation proceedings, the general rule was that the landowner was entitled to the value of the property as of the time of trial. The landowner argued, however, that if the taking did not occur until the government deposited the money, it should receive the value of the property in 1982, not in 1979. The Court agreed that, under the fifth amendment to the United States

Constitution (U.S. Const., amend. V), a landowner is "constitutionally entitled to the fair market value of its property on the date of the taking." Kirby, 467 U.S. at 16, 81 L. Ed. 2d at 14, 104 S. Ct. at 2197. In that case, that meant the property's value in 1982. In order to meet the constitutional mandate that the landowner receive just compensation as of the date of taking, where there had been (1) a substantial delay between the date on which the value of the land was set and the date on which the property was actually appropriated, and (2) a material change in the value of the land during that time, the trial court should take action to determine the change in the value of the land during that period and modify the judgment to reflect that change. Kirby, 467 U.S. at 18-19, 81 L. Ed. 2d at 15-16, 104 S. Ct. at 2198-99.

The government argued that a general rule fixing a date of valuation in all cases (like the rule setting the time of trial as the date of valuation) was necessary for practical reasons, so that the trier of fact would know the date on which the value of the land would be assessed. The Court acknowledged the attraction of this argument, but it was firm that such concerns could not override the constitutional mandate of just compensation:

"The Government's argument provides a plausible explanation for the valuation procedure used in this case and other cases, but it does not meet petitioner's constitutional claim. However reasonable it may be to designate the date of trial as the date of valuation, if the result of that approach is to provide the owner substantially less than the fair market value of his property on the date the [government] tenders payment, it violates the Fifth Amendment." (Emphasis added.) Kirby, 467 U.S. at 17, 81 L. Ed. 2d at 15, 104 S. Ct. at 2198.

Thus, in those instances where the general rule fixing the date of valuation produced an award that was materially different from the property's fair market value at the time it was actually taken, the award must be modified. This could be accomplished through an evidentiary hearing, in which the evidence presented was limited to the change in the value of the property during the condemnation proceeding. However, the Court commented that legislatures and courts were free to identify other means of reaching the result of just compensation. Kirby, 467 U.S. at 18-19 & n.30, 81 L. Ed. 2d at 15-16 & n.30, 104 S. Ct. at 2198-99 & n.30.

Remarkably, no Illinois court has had occasion to apply the mandates of Kirby, despite the passage of over 25 years since that decision was issued. This court has cited Kirby in passing, commenting that "when a condemnation suit continues for several years, the right to just compensation" might be infringed. People ex rel. Department of Transportation v. Firstar Illinois, 365 Ill. App. 3d 936, 942 (2006). However, the comment related to our review of a trial court's discovery rulings in a condemnation case, not to just compensation directly. So far as we can determine, this case is the first to present to a reviewing court the question of whether the fifth amendment, as interpreted in Kirby, requires modification of Illinois's traditional date-of-filing rule of valuation and its fault-based exception.

### B. What Constitutes "Just Compensation"?

There is no dispute that, for purposes of the fifth amendment to the United States Constitution and its counterpart in the Illinois Constitution (Ill. Const. 1970, art. I, §15), just compensation requires that the landowner is put "in as good a financial condition after the transfer as it was before." City of Mt. Vernon, 11 Ill. 2d at 552. As our supreme court noted in Chapin, there is unanimous agreement that "just compensation" is the fair market value of the property at the time

that it is taken. Chapin, 226 Ill. at 503; accord Kirby, 467 U.S. at 16, 81 L. Ed. 2d at 14, 104 S. Ct. at 2197. There is some dispute, however, over when the property is "taken" under Illinois law.

In Kirby, the Supreme Court held that, in federal condemnation proceedings, "the date of taking must be deemed the date the United States tenders payment to the owner of the land." Kirby, 467 U.S. at 11, 81 L. Ed. 2d at 11, 104 S. Ct. at 2194. The landowner argued that its ability to use its land as it wished was "taken" on the date that the condemnation proceeding was filed, but the Supreme Court rejected this argument because the record did not reflect any substantial impairment of the landowner's property rights before the government tendered payment for the land. As the federal government may dismiss a condemnation suit at any time before the moment it actually tenders payment, under federal law the transfer of the land to the government does not occur until that moment. Kirby, 467 U.S. at 11-12, 81 L. Ed. 2d at 11-12, 104 S. Ct. at 2195.

The plaintiff argues that, for a variety of reasons, the holding of Kirby does not apply to Illinois condemnations. First, it argues, the fifth amendment to the United States Constitution, applied to the states through the due process clause of the fourteenth amendment, requires only that the process for setting just compensation afford the landowner due process--that is, notice and an opportunity to be heard--and does not require that the result of that process actually amount to just compensation. In support, the plaintiff cites Fallbrook Irrigation District v. Bradley, 164 U.S. 112, 41 L. Ed. 369, 17 S. Ct. 56 (1896). However, a long line of cases dating back over a century is to the contrary. See Kelo v. City of New London, Connecticut, 545 U.S. 469, 472 & n.1, 162 L. Ed. 2d 439, 447 & n.1, 125 S. Ct. 2655, 2658 & n.1 (2005) (a recent Supreme Court case in which the issue before the Court was whether a taking under Connecticut state law complied with the fifth amendment), citing Chicago, Burlington & Quincy R.R. Co. v. City of Chicago, 166 U.S. 226, 241,

41 L. Ed. 979, 986, 17 S. Ct. 581, 586 (1897) (the fifth amendment applies to the actions of a state through the fourteenth amendment, requiring not only that due process be provided, but that the state's procedures yield a result that substantively complies with the fifth amendment's requirements of public purpose and just compensation).

Next, the plaintiff argues that the Supreme Court expressly exempts states such as Illinois from the reach of its decisions regarding the date of a taking, citing Danforth v. United States, 308 U.S. 271, 84 L. Ed. 240, 60 S. Ct. 231 (1940). In that case, in which the Court first held that the date of a taking is the date on which the government pays for the land, the Court stated that its holding did not apply to jurisdictions in which the taking occurs "by a statutory provision, which fixes the time of taking by an event such as the filing of an action." Danforth, 308 U.S. at 284, 84 L. Ed. at 246, 60 S. Ct. at 236. The plaintiff argues that Illinois has such a statutory provision fixing the date of a taking as the date when the condemnation action was filed: section 7--121 of the Act. But section 7--121 says nothing about the date on which a taking occurs. Rather, it concerns only the date on which the land subject to condemnation is to be valued, and it sets that date of valuation as the date on which the condemnation suit was filed. 735 ILCS 5/7--121 (West 1998) (stating that the fair market value of property in an eminent domain proceeding "shall be determined and ascertained as of the date of filing the complaint to condemn"). Thus, the Danforth exception does not exclude Illinois from the reach of Kirby.

The plaintiff also argues that Illinois courts have held that the date of a taking is the date on which the condemnation action was filed, citing pre-Kirby cases such as City of Chicago v. McCausland, 379 Ill. 602 (1942), and City of Chicago v. Collin, 302 Ill. 270 (1922). However, the cases cited by the plaintiff concern whether landowners were liable for property taxes assessed after

condemnation complaints had been filed. In each case, the supreme court held that the compensation to be paid to the owner could not be reduced by liens (even tax liens) filed after the condemnation complaint was filed, because upon the completion of condemnation and the government's payment for the property, the title to the property dated back to the filing of the complaint, and therefore the legal rights associated with the property became fixed at that point. See McCausland, 379 Ill. at 604-05. Since those cases were decided, the Illinois Supreme Court has explained and qualified these holdings, stating that, although there is a "legal fiction" that the date of filing is the date of the taking (because if the government eventually acquires the land, its title dates back to that point), "in a more corporeal sense" the taking does not occur until compensation for the land has been paid, because until that point, the owners "continue to enjoy title and the rights associated with possession of the property." Forest Preserve District v. West Suburban Bank, 161 Ill. 2d 448, 455-56 (1994) (noting prior contradictory lines of cases regarding the "date of taking" in condemnation cases). In discussing the date of the taking, the court also noted that in Illinois (as in federal takings), up until the moment that compensation is paid, "the condemning [body] may abandon the proceeding, leaving [the owners] with their property." West Suburban Bank, 161 Ill. 2d at 456. Thus, "[a]lthough the value of the property taken is determined as of the date the eminent domain petition is filed," title to the property does not pass and "the condemnor is not entitled to possession until the amount found to be just compensation has been paid to the owner or deposited, pursuant to statutory authority, for his benefit." City of Chicago v. R.R. Building Corp., 24 Ill. 2d 20, 22 (1962).

The plaintiff is therefore incorrect in its argument that, under Illinois law, the date of a taking is the same as the date of filing. Rather, Illinois courts view the filing of a condemnation action as the first step in a process that may lead to the government's acquisition of land. Because any

acquisition would date back to the date of filing, liens are fixed as of that date, and anyone who acquires an interest in the land subsequent to the filing of the condemnation action takes that interest subject to the pending condemnation. McCausland, 379 Ill. at 604-05. Nevertheless, the government retains its ability to dismiss the condemnation suit at any point, and title and its associated rights are not transferred to the government until it tenders payment for the land. West Suburban Bank, 161 Ill. 2d at 456. Thus, for purposes of the fifth amendment, we believe that for Illinois takings just as for federal takings, the date of the taking is the date on which the government actually acquires the property by paying for it. And, as previously noted, just compensation requires the property to be valued as of the date of the taking, or at least close enough to that date that the value set does not substantially shortchange the owner. Kirby, 467 U.S. at 16, 81 L. Ed. 2d at 16, 104 S. Ct. at 2197.

### C. Were the Defendants Denied Just Compensation in This Case?

There is no question that, pursuant to the United States and Illinois Constitutions, the defendants were entitled to receive just compensation for the Property, i.e., its fair market value at the time of the taking. The next inquiry--whether the defendants were denied just compensation in this case--is not a question that this court can answer on the current record. The jury found that the Property had a value of approximately $10.7 million in December 1999. In their posttrial motion, the defendants presented an appraisal suggesting that the value of the Property at the time of trial in December 2007 was at least $25.5 million. However, the plaintiff has not had the opportunity to proffer contrary evidence of the Property's value as of the time of trial, and the trial court has not weighed any such evidence. Thus, on appeal, we cannot resolve the question of whether the defendants received just compensation for the Property.

Nevertheless, the record is sufficient to allow us to conclude that the trial court erred in failing to address the just-compensation issue raised by the defendants. In Kirby, the Supreme Court held that some modification in ordinary valuation procedures is necessary where (1) there has been a substantial delay between the traditional date of valuation and the date of the taking, and (2) there has been a material change in the value of the land during that time. Kirby, 467 U.S. at 18-19, 81 L. Ed. 2d at 15-16, 104 S. Ct. at 2198-99. Here, there was a delay of eight years between the filing of the condemnation case and the payment of the $10.7 million judgment. We hold that, in this case, eight years constituted a substantial delay. Moreover, although the appraisal proffered by the defendants is by no means conclusive as to the Property's value at the time of trial, it is sufficient to suggest that the value of the Property materially changed during those eight years. As our supreme court has declared, the owner of condemned land must be put in "as good a financial condition after the transfer as it was before," because "[n]othing short of such an amount conforms to the constitutional requirement of just compensation." City of Mt. Vernon, 11 Ill. 2d at 552. The defendants have submitted sufficient evidence to suggest that the jury's verdict did not meet that requirement here. Accordingly, we hold that the trial court erred in denying the defendants' motion for a hearing to determine whether there had been a substantial increase in the value of the Property during the pendency of the case, and we remand for the trial court to hold such a hearing.

D. Did the Defendants Forfeit Their Right to Just Compensation?

The plaintiff and the intervenor argue that a remand for an inquiry into just compensation is unnecessary because, in various ways, the defendants have forfeited their right to seek any valuation for the Property other than the value on the date of filing. First, they argue that the defendants' claim for just compensation was procedurally defaulted, because the defendants failed to raise the correct

arguments and seek an appropriate remedy before the trial court. In addition, they argue that Illinois law provides methods by which a landowner can be compensated for rising land values during lengthy condemnation proceedings, but the defendants failed to take advantage of these methods and so have forfeited their right to seek such compensation. They also argue that the defendants should be barred from receiving the value of the Property at the date of the taking because the defendants' own actions contributed to the delays in the case. We examine each argument in turn, bearing in mind that "waivers of constitutional rights are not to be lightly inferred, and that every reasonable presumption against such waiver should be indulged." Woods v. Brucker Co., 129 Ill. App. 3d 983, 987 (1984).

1. Failure to Raise the Constitutionality of Section 7--121

The plaintiff and the intervenor first argue that the defendants forfeited their right to seek just compensation as measured at the time of trial, because before the trial court the defendants (1) never claimed that section 7--121 (which requires courts to use the date of filing as the date of valuation) was unconstitutional as applied to them, and (2) asked only for a posttrial Kirby hearing rather than asking for a different date of valuation or tendering jury instructions that would focus on a more current date of valuation. We find that, under the circumstances of this case, neither of these actions constitutes forfeiture of the issue.

The procedural history is as follows. In March 2007, having resolved all of the other challenges to the taking, the parties entered into what appears to be their final amended case management agreed order, which established an eight-month schedule for the completion of discovery related to the issue of just compensation. The schedule called for disclosure of all expert

witnesses' opinions and reports by May 2007. The parties then proceeded with depositions of those experts, with the date for a final pretrial conference set for early November.

On August 3, 2007, the defendants filed their motion seeking a Kirby hearing. In that motion, the defendants argued that the just-compensation guarantee contained in the fifth amendment applied to Illinois condemnation cases and that, under Kirby, just compensation required that the owner receive substantially what the property was worth on the date the government tendered payment. The defendants asserted that the value of their land had increased since the "date of value in this case, December 19, 1999." The motion analyzed Kirby in detail, noted that Illinois law (specifically, section 7--121) required the use of the date of filing as the date of valuation, and requested a posttrial hearing "to determine whether the value of the subject property has materially changed" during the pendency of the case. In support of their request, the defendants cited Kirby and the recent amendments to the Act, which allowed the use of a different date of valuation. The motion requested only one form of relief, a posttrial hearing at which the trial court would determine whether there had been an increase in the value of the land since 1999 and, if so, set just compensation based on the date of the taking. Notably, the motion did not challenge the constitutionality of section 7--121 or ask that the jury be instructed on a different date of valuation than that required by the statute. Indeed, the motion insisted that section 7--121 must be applied and that the 1999 date of valuation must be used for the jury trial.

In contemplating this course of events, we are dismayed by the defendants' failure to raise the issue of just compensation until five months of expensive expert discovery had passed, and we are appalled at the waste of judicial resources inherent in the defendants' request that the jury be asked to determine the 1999 value of the Property but that the determination should then be set aside

and the current value of the Property be determined. Nevertheless, our review of the record suggests that the defendants were not the only ones who were late in realizing the potential problems posed by the interaction of section 7--121, which set the date of valuation as the date on which the complaint was filed, and the constitutional requirement of just compensation as of the date of the taking. In response to the defendants' motion, the plaintiff argued that the trial court must follow the statutory mandate of section 7--121, which was based on over a century of Illinois case law, and that the fault-based exception to the date-of-filing rule did not apply because the delay in the case was not solely attributable to the plaintiff. However, it did not address in any manner <u>Kirby</u> or the constitutional requirement of just compensation. The trial court likewise declined to grapple with the constitutional issue raised by the defendants, and denied their motion based solely on the lengthy precedent for applying the date-of-filing rule. We also note that everyone appears to have overlooked the primary flaw in the remedy that the defendants requested: although the defendants requested that the current value of the Property be determined by the trial court, the Illinois Constitution requires that just compensation be decided by a jury. Ill. Const. 1970, art. I, §15 ("Private property shall not be taken or damaged for public use without just compensation as provided by law. Such compensation shall be determined by a jury as provided by law"). Neither the parties nor the judge seemed to be aware of the significance of this requirement, which was not mentioned as a reason to deny the request for a posttrial <u>Kirby</u> hearing before the judge and was raised for the first time on appeal.

Under these circumstances, we decline to find that the defendants forfeited their right to just compensation, either because they did not initially challenge the constitutionality of section 7--121 as applied to this case or because, although they correctly identified the constitutional right they were

asserting, they requested a remedy that the parties have now discovered is not available. Generally speaking, the issue of a statute's constitutionality may be raised at any time. In re S.F., 359 Ill. App. 3d 63, 65 (2005). An appellate court may permit a party to file a late notice pursuant to Rule 19 and address the constitutionality of a statute for the first time on appeal if the purpose of the rule (providing the Attorney General with the meaningful opportunity to participate) has been served, and the opposing party is not prejudiced because it was aware of the constitutional nature of the claim. Village of Lake Villa v. Stokovich, 211 Ill. 2d 106, 116-17 (2004); see also Unzicker v. Kraft Foods Ingredients Corp., 203 Ill. 2d 64, 73-74 (2002) (declining to find constitutionality of a statute forfeited where it was a purely legal issue that had been fully briefed and consideration of the issue would serve the public interest). Here, the plaintiff was aware of the defendants' contention that the application of section 7--121 would deny them just compensation, and the Attorney General was given the necessary opportunity to intervene in this appeal and present her views on the constitutionality of the statute. Thus, the fact that the defendants did not challenge the constitutionality of section 7--121 before the trial court is not a bar to their current challenge to the statute in our court.

It is regrettable that the defendants did not argue that section 7--121 was unconstitutional, or submit instructions that (contrary to section 7--121) told the jury to find the value of the Property as of some more recent time, such as the time of trial. It appears that the defendants did not believe that directly challenging the law would be necessary, because they mistakenly thought that a posttrial Kirby hearing would be a viable solution to achieve just compensation. However, their motion clearly stated a constitutional claim, along with a request for an alternate valuation procedure to ensure that they received just compensation. In a somewhat comparable context, section 2--617 of

the Code of Civil Procedure (735 ILCS 5/2--617 (West 2008)) provides that, where a plaintiff seeks relief that the court ultimately determines is not available, but the plaintiff has established facts entitling him or her to relief of a different kind, the court may permit amendments to the relief sought and may grant any relief to which the plaintiff is entitled on the evidence. Indesco Products, Inc. v. Novak, 316 Ill. App. 3d 53, 57 (2000) (plaintiffs permitted to amend their complaint where they inadvertently sought a form of relief that could not be granted, but their complaint alleged facts entitling them to relief). Here, the parties seeking the wrong remedy were the defendants, whose motion sought a remedy (a determination of just compensation by a judge rather than a jury) that this court determines is not available, but who presented facts entitling them to some manner of relief in order to be awarded just compensation. We reject the argument that the defendants forfeited their constitutional claim by failing to challenge section 7--121 and asking for a Kirby hearing instead.

### 2. Failure to Seek Dismissal or a Speedy Trial

In addition, the plaintiff and the intervenor raise a related argument, arguing that the defendants failed to avail themselves of the means that exist under Illinois law to obtain just compensation when a condemnation case drags on and the land's value rises during the interim. Specifically, they argue that Illinois law provides condemnation defendants with two means of correcting for unreasonable delay in the proceedings and the consequent denial of just compensation: moving to dismiss the condemnation case or requesting a "speedy trial." Blue Island, 49 Ill. 2d at 411. As the defendants did not seek to avail themselves of either of these remedies, they argue, the defendants cannot now complain that they were denied just compensation.

In support, the intervenor cites Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 87 L. Ed. 2d 126, 105 S. Ct. 3108 (1985). In that case, the

Supreme Court refused to reach the issue of whether the landowner had been denied just compensation for a claimed regulatory taking because the claim was not ripe: the plaintiffs had not used an existing state-law remedy, an inverse condemnation suit, to seek compensation for the property in state court. Instead, they had filed an action pursuant to section 1983 of Title 42 of the United States Code (42 U.S.C. §1983 (1982)) in federal court. The Court stated that, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." Williamson County, 473 U.S. at 195, 87 L. Ed. 2d at 144, 105 S. Ct. at 3121. The state procedure must be a " ' "reasonable, certain and adequate provision for obtaining compensation." ' " Williamson County, 473 U.S. at 194, 87 L. Ed. 2d at 144, 105 S. Ct. at 3120, quoting Regional R. Reorganization Act Cases, 419 U.S. 102, 124-25, 42 L. Ed. 2d 320, 343, 95 S. Ct. 335, 349 (1974), quoting Cherokee Nation v. Southern Kansas Ry. Co., 135 U.S. 641, 659, 34 L. Ed. 295, 303, 10 S. Ct. 965, 971 (1890). The intervenor argues that, under Williamson County, the defendants cannot claim that the application of section 7--121 denied them just compensation, because they did not use the procedures that exist under Illinois law--seeking dismissal or demanding a speedy trial--to seek a more current value for the Property.

The trouble with this "procedural forfeiture" argument is that, to qualify under Williamson County, the state procedures existing at the time of the taking must be reasonable, certain, and adequate to provide just compensation to the landowner. In this case, however, the first option identified--dismissal-- was not available to the defendants, and the second--a speedy trial of the condemnation proceeding--is a legal mystery and perhaps a mirage. In Blue Island, the supreme court noted that obtaining just compensation for property when there was a delay in the

condemnation proceeding (which it called "the right to recover damages for the delay") could be accomplished through the forced dismissal and possible refiling of the case, but this remedy was available only where none of the delay was caused by the landowner. Blue Island, 49 Ill. 2d at 411. Because in Blue Island the first attorneys for the defendant had agreed to continuances, the defendant was unable to be compensated for the rise in his property's value while the case was pending. Blue Island established that dismissal of a condemnation case for delay is available only when the delay was entirely the fault of the condemning authority. Blue Island, 49 Ill. 2d at 412 (the defendant could not be compensated for the rise in his property's value during the four years that the case was pending, because the delay could not "all be attributed to the condemning authority").

This is a high standard for a landowner to meet, and it cannot be met in this case. Here, although the defendants assert that they did not intentionally or unreasonably delay the proceedings, they also concede that the delay was not solely the fault of the plaintiff. Thus, under Blue Island, they had no grounds to seek a dismissal on the basis of delay. Having no grounds for a dismissal, it would have been a waste of the parties' and the trial court's resources for the defendants to move for such a dismissal. The law does not require the doing of a futile act, and the failure to seek a particular remedy will not prejudice a litigant where that remedy would not have been granted. Keefe-Shea Joint Venture v. City of Evanston, 332 Ill. App. 3d 163, 177 (2002). Accordingly, the defendants' failure to move to dismiss this case on the basis of delay cannot be construed as a procedural forfeiture of their right to just compensation.

Should the defendants instead have requested a "speedy trial"? Although the court in Blue Island suggested that the landowner there might have been able to obtain a just measure of compensation for his property if he had made such a request, it is unclear what that phrase refers to

in a condemnation case. A defendant in a criminal case may seek a speedy trial through a statutory procedure, but there is no comparable procedure for a "speedy trial" in the civil context. Presumably, a party could make a formal request to set the case for trial on the first available date. Would such a request require the parties to cut short discovery? Would it require a defendant to forgo its right to file a traverse opposing the condemnation, or prevent the plaintiff from bringing motions for summary judgment on the issues raised in the traverse, as the plaintiff did here? Would the trial court be required to grant such a request for a speedy trial? If it did not, would that restore the defendant's right to seek a more current valuation for the property that the plaintiff seeks to take? What about cases where, as here, the ownership of the property was the subject of a pending legal dispute when the condemnation complaint was filed?

Illinois law provides no answers to these questions. Indeed, we have not found any case in which a speedy condemnation trial was requested. Because it is unclear what is meant by the "speedy trial" remedy that the plaintiff and the intervenor argue the defendants should have sought, that remedy is not sufficiently "certain and adequate" under Williamson County to serve as a viable alternate method for seeking just compensation. Accordingly, we decline to hold that the defendants' failure to seek such a remedy constituted a procedural forfeiture of its just-compensation claim.

### 3. Participation in Actions That Delayed the Resolution of the Case

The plaintiff and the intervenor next argue that the defendants are not eligible to receive just compensation for the Property (that is, the value of the Property at the time of the taking rather than on the date of filing) because the defendants themselves were at fault for some of the delays in the case. As they point out, equitable considerations may play a part in setting just compensation (United States v. Fuller, 409 U.S. 488, 490, 35 L. Ed. 2d 16, 19-20, 93 S. Ct. 801, 803 (1973)), and

compensation ultimately paid must be "just" to both the landowner and the public that pays the bill (United States v. Commodities Trading Corp., 339 U.S. 121, 123, 94 L. Ed. 707, 711-12, 70 S. Ct. 547, 549 (1950)). Both the plaintiff and the intervenor argue that it would not be "just" to the condemnor to impose costs on it that were caused by the rising value of the property during a condemnation case that was delayed by the landowner. They argue that the Illinois fault-based exception to its date-of-filing rule is an appropriate expression of these equitable considerations. They note that, in Kirby, the Supreme Court held that states were free to create their own procedures to set just compensation, so long as those procedures in fact resulted in just compensation. Kirby, 467 U.S. at 18-19 & n.30, 81 L. Ed. 2d at 15-16 & n.30, 104 S. Ct. at 2198-99 & n.30. Thus, they argue, the trial court was correct to apply Illinois law and hold that the defendants could not obtain a modification of the Property's valuation because, as the defendants conceded, the plaintiff was not wholly at fault for the delay in the proceeding. See Blue Island, 49 Ill. 2d at 411.

There are appealing aspects to an approach that would prevent a landowner who has caused the delay of the condemnation proceeding from benefitting from a rise in prices during the delay, and there may be cases in which the landowner's actions in causing the delay warrant the imposition of some penalty. In this case, however, the record does not establish that the defendants deliberately sought to delay the proceedings. Did they fight the condemnation tooth and nail? It appears that they did. Did they fight among each other, with the result that the condemnation proceeding was delayed? The record suggests so. Nevertheless, the trial court made no finding that the defendants intentionally delayed the proceedings here or engaged in frivolous legal tactics. Nor does the record permit us to draw that conclusion on appeal.

Generally, a party may not be sanctioned for ordinary delays in a case, but only where it has intentionally obstructed the proceedings. See, e.g., Willeford v. Toys "R" Us-Delaware, Inc., 385 Ill. App. 3d 265, 277 (2008) (sanctions were appropriate where party unreasonably delayed its challenge to discovery order and did not act in good faith). A party may also be found in contempt of court and sanctioned where it has deliberately and willfully engaged in conduct calculated to obstruct or hinder the court's administration of justice (Circle Management, LLC v. Olivier, 378 Ill. App. 3d 601, 612 (2007)), and may also be sanctioned even without a finding of contempt for deliberately disregarding the court's authority, such as by willfully disobeying a valid court order (Olivier, 378 Ill. App. 3d at 613). We have no basis for concluding that the defendants engaged in this type of deliberate obstruction in this case, however. Thus, imposing a "sanction" on their conduct of the case by denying them just compensation--a "sanction" that, in this case, might be equal to more than half of the current value of their property--is not appropriate.

In addition, there is the legal question of whether, short of deliberate obstruction, a party's "fault" for a delay can be the basis for denying that party just compensation. The intervenor argues that it can be, citing three cases: Sarpy County, Nebraska v. United States, 386 F.2d 453, 461 (Ct. Cl. 1967); City National Bank of Miami v. United States, 33 Fed. Cl. 759, 765 (1995); and County of Los Angeles v. Bartlett, 203 Cal. App. 2d 523, 535, 21 Cal. Rptr. 776, 783 (1962). However, none of these cases supports the proposition that delay in a pending condemnation case is an appropriate basis for denying a landowner just compensation. In Sarpy County, the federal government "took" a road by closing it, and was therefore required to provide the county with the cost of a new road. The county did not bring its compensation claim for several years after the taking, and it then argued that it should receive what it would cost to build a replacement road at the

time of the suit, rather than at the time that the federal government actually took the earlier road. The court of claims disagreed, noting that compensation "is measured as of the date of the taking," and commented that, "[i]n fixing 'just' compensation, it would hardly be fair to impose costs on the taker which have been inflated by the long delay either in constructing substitute facilities or in bringing an appropriate action." Sarpy County, 386 F.2d at 461. The holding of Sarpy County does not apply here, because in that case the condemnee delayed the commencement of the proceedings and then sought an amount beyond the cost at the time of the taking, whereas in the case before us, there was no delay in the commencement of the condemnation case, and the defendants are seeking only the value of their land at the time of the taking--which, as the court in Sarpy County noted, is the appropriate measure of just compensation.

Similarly, in City National Bank, 33 Fed. Cl. at 765, there was no dispute that the property owner should receive the value of the land as of the date of the taking. However, the court rejected the owner's argument that the land actually had been "taken" several years earlier, when the Army Corps of Engineers restricted the owner's mining operations. The court noted that, although the Corps ordered the owner to cease its mining operations in 1977 because it had no valid mining permit, the owner made the decision not to proceed with an appeal of that restriction or to renew its permit application until related litigation was resolved, with the result that the Corps did not actually "take" the owner's rights until 1993, when it denied the new permit application that the owner eventually filed. In those unusual circumstances, and taking into account that the owner itself had insisted (when arguing a statute of limitations issue) that 1993 was the date of the taking, the court held that the date of the taking could not be pushed back to 1977. City National Bank, 33 Fed. Cl. at 765. In City National Bank, as in Sarpy County, the delay at issue was the landowner's own delay

in commencing proceedings to challenge (or be reimbursed for) the taking. It is that delay, when the landowner was deciding whether to make a claim, not the delays inherent in the litigation process once it was commenced, that the courts in these cases refused to allow the landowner to benefit from. Thus, these cases are not applicable here, where the issue is the length of time necessary for the resolution of a pending condemnation case. The final case cited by the intervenor, County of Los Angeles, is similarly distinguishable, in that the landowners there stipulated that the date of valuation for purposes of the condemnation trial would be December 12, 1958, and the appellate court therefore rejected the owners' later argument that the date of trial should be used as the date of valuation instead. County of Los Angeles, 203 Cal. App. 2d at 534, 21 Cal. Rptr. at 782-83. No such stipulation occurred in this case.

We have not found any other cases suggesting that a landowner's "fault" in causing some portion of the delay in resolving a condemnation case is a proper basis for denying the owner just compensation (the value of the land at the time of the taking). Rather, at least one court confronting this issue has held to the contrary. In Utah State Road Comm'n v. Friberg, 687 P.2d 821, 834 (Utah 1984), the state road commission sought to condemn the Fribergs' land for a highway. The condemnation proceeding was delayed for approximately eight years by two suits in federal court, both of which resulted in injunctions until the state complied with certain federal requirements. The Fribergs supported the federal suits. A Utah statute set the date of valuation for condemnation purposes as the date on which the summons was served, and the Fribergs moved for a different date of valuation, contending that using the date of summons would deny them just compensation for the value of their land, which had risen during the pendency of the condemnation case. The state argued that the Fribergs were not entitled to recover the increase in value because the delay in the case was

their own fault. The Utah Supreme Court held that the parties' conflicting arguments about who was at fault for delays in the case were ultimately irrelevant, because the Fribergs could not be penalized for exercising their legal rights to oppose the condemnation:

"Preliminarily, we note that fault is not really the issue here. The law does not require [a] landowner[] to meekly yield to the State's claim to condemn his or her land. Every landowner in this country has a right to resist with every legal means available the expropriation of his or her land. The right of eminent domain does not require docile passivity on the part of a landowner. ***

Since the State has the burden of proving its right to exercise the power to condemn [citations], the State must be prepared to establish that it has complied with all necessary conditions precedent." Friberg, 687 P.2d at 834.

The court concluded that "[t]he delay occasioned by the federal actions cannot justify penalizing the Fribergs by denying them a part of the value of their property, which appreciated while those actions were pending." Friberg, 687 P.2d at 834-35; see also Township of Piscataway v. South Washington Avenue, LLC, 400 N.J. Super. 358, 373, 947 A.2d 663, 672 (2008) (despite delays in condemnation proceedings, condemnees exercising their legal rights may not be penalized by denying them the fair market value of their property at the time of taking).

In reaching this conclusion, the Utah Supreme Court did not adopt an absolute rule that would permit a landowner to engage in abusive litigation tactics without repercussions. The court considered whether the Fribergs had engaged in tactics that unjustifiably protracted the condemnation case, and it concluded that they had not. "All they did was pursue an established, well-recognized and well-founded legal remedy to compel the State to comply with federal law."

Friberg, 687 P.2d at 834. In the absence of abusive tactics, the court held, the Fribergs could not be penalized for their assertion of their legal rights by requiring them to give up the constitutional right to just compensation for their land. Friberg, 687 P.2d at 835.

The approach adopted by the Utah Supreme Court in Friberg--that, absent abusive litigation tactics by the landowner, the landowner may not be denied just compensation on the ground of litigation delays--is legally sound and strikes an appropriate balance between maintaining a landowner's constitutional rights and ensuring that the courts' ability to administer justice is not impaired. By contrast, the plaintiff's reading of Blue Island, as holding that a landowner gives up all right to a true valuation of the land at the time of the taking if the landowner so much as acquiesces to continuances, unduly restricts the landowner's ability to exercise his or her right to resist the taking and put the condemnor to its proof. This reading, with its emphasis on even minimal levels of "fault" for delays in condemnation proceedings, cannot be squared with the Supreme Court's statement in Kirby that, while states are free to adopt their own methods for determining just compensation for takings, any such method must provide the owner with the fair market value of his or her property on the date of the taking. Kirby, 467 U.S. at 17, 81 L. Ed. 2d at 15, 104 S. Ct. at 2198. In light of the Supreme Court's firm admonition, we do not believe that a landowner can be denied just compensation on the ground that he or she was in some way at fault for the length of the condemnation proceeding, unless the landowner's conduct rose to the level of abusive litigation tactics that interfered with the court's functioning. Here, the current record does not reflect that the defendants engaged in abusive tactics--they simply fought, both the plaintiff and each other. Thus, the defendants' request for just compensation, to be determined as of the date of

the taking, cannot be denied on the ground that the defendants are at fault for the length of the proceedings.

### E.  Should the Amendments to the Act be Applied Here?

Although we must be chary in finding a waiver of a constitutional right (Woods, 129 Ill. App. 3d at 987), we must also avoid passing on the constitutionality of a statute if the case may be decided on some other ground (People v. Carpenter, 228 Ill. 2d 250, 264 (2008)).  We therefore asked the parties to provide us with supplemental briefing on the legislature's recent amendments to the Act, because the application of those amendments might spare us from considering the constitutionality of the old section 7--121 of the Act.  However, the parties' briefs made it clear that the amendments cannot be applied in this case.

In 2006, the Illinois legislature enacted a new Eminent Domain Act (735 ILCS 30/1--1--1 et seq. (West 2008)), one portion of which now permits a court, under certain circumstances, to set the value of property as of a date after the date of the condemnation complaint:

"For the acquisition of [property other than property taken or damaged under the O'Hare Modernization Act], the amount shall be determined and ascertained as of the date of filing the complaint to condemn, except that:

(I) *** if the trial commences more than 2 years after the date of filing the complaint to condemn, the court may, in the interest of justice and equity, declare a valuation date no sooner than the date of filing the complaint to condemn and no later than the date of commencement of the trial."  735 ILCS 30/10--5--60 (West 2008).

The effective date of the new Act was January 1, 2007.  735 ILCS 30/99--5--5 (West 2008).

As the parties point out, the new Act itself contains a provision stating that "[t]his Act applies only to complaints to condemn that are filed on or after its effective date." 735 ILCS 30/90--5--5 (West 2008). The condemnation complaint in this case was filed in 1999, and thus under the terms of the new Act it would not apply. However, the defendants argue that the new Act should be applied despite section 90--5--5's limitation, because a legislature's power to declare whether an enactment should be given prospective or retroactive application is subject to constitutional requirements. See Commonwealth Edison Co. v. Will County Collector, 196 Ill. 2d 27, 38 (2001) (stating the basic principle that, "if the legislature has clearly indicated what the temporal reach of a[] *** statute should be, then, absent a constitutional prohibition, that expression of legislative intent must be given effect"). The defendants argue that applying the old statute would violate their fundamental rights to just compensation and equal protection, because they would be denied just compensation for their property, while other property owners facing condemnation suits filed after January 1, 2007, would be able to receive such compensation.

In response, the intervenor argues that this "absent a constitutional prohibition" caveat refers only to situations in which the legislature's statement regarding the temporal scope of the enactment is itself unconstitutional for some reason. She suggests that no fundamental right is at stake here and thus any distinction drawn by the legislature in determining who should get the benefit of the new law is subject only to rational-basis scrutiny, which could be met by a relatively slight benefit such as administrative convenience. The intervenor further argues that the court cannot ignore the plain words of the statute and that the proper approach is not to apply the amendments contrary to the legislature's wishes, but to apply the old statute and then uphold it or invalidate it as necessary.

We find this second point persuasive. The words of the statute prevent us from applying the amendments to this case. Framing the issue of the amendment's application in constitutional terms does not change this outcome. At bottom, the defendants' challenge is to the substance of the old statute (the requirement that condemned property be valued as of the date of filing), not the legislature's action in limiting the new law to recently filed cases. If the old statute is constitutional as applied, then there would be no reason to apply the new law retroactively. But we would first have to determine whether the old statute is constitutional in order to know whether we should apply the new amendments, and thus applying the amendments would serve no purpose. In short, we cannot avoid addressing the constitutionality of the old act on the ground that the amendments apply.

## F. Remand

As we determined earlier, the trial court erred in failing to hold a hearing on whether the jury's verdict provided the defendants with just compensation, that is, the value of the Property on the date of the taking. Thus, remand is necessary to permit the presentation of evidence on this issue. The procedure on remand potentially involves two steps. If, on remand, the trial court finds that the amount of the jury's verdict did provide the defendants with just compensation for the Property, it may reinstate that verdict. However, if the trial court finds that the current value of the Property is materially different than the amount of the jury's verdict, then it must find that the application of section 7--121 to this case would violate the fifth amendment. Under those circumstances, section 7--121's command that the Property be valued as of the date that the condemnation action was filed would violate the constitutional requirement that the defendants receive just compensation, i.e., the

value of the Property at the time of the taking.  Such a finding would, in turn, require the trial court to proceed with the second step and set the case for a new trial.

The plaintiff argues that a finding that section 7--121 of the Act is unconstitutional as applied to this case would be contrary to the supreme court's decision in Blue Island.  This argument is incorrect, and not only for the reason that section 7--121 had not yet been enacted when Blue Island was decided and therefore was not at issue in that case.  In Blue Island, our supreme court upheld the traditional date-of-filing valuation rule in the face of the landowner's assertion that the use of that rule would violate his constitutional right to just compensation.  However, that case was decided before Kirby, in which the United States Supreme Court held that usual rules of valuation must give way when the result of applying such rules does not comport with the requirement of just compensation.  When the issue is the interpretation of a provision of the United States constitution such as the fifth amendment, the interpretation adopted by the United States Supreme Court is paramount and supreme.  M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 326-27, 4 L. Ed. 579, 582 (1819) (the constitution is the supreme law of the land, and the Supreme Court has "the ultimate power of deciding all questions arising under the constitution").  Thus, both this court and the trial court are bound to follow the dictates of Kirby with reference to the issue of just compensation.

We also note that, in the event that the trial court finds that the application of section 7--121 did not provide just compensation in this case and therefore finds that the statute cannot be applied here, the trial court would be reaching a decision that would be in accord with the more than half a dozen courts in other states that have confronted the same issue.  In their supplemental brief, the defendants note that the supreme courts of Utah and New Mexico, and appellate courts in Arizona and California, have determined that state statutes setting the date of valuation as some date other

than the date of the taking must yield when that statutory scheme produces a value substantially below the value of the taken property at the time of taking. See County of Dona Ana v. Bennett, 116 N.M. 778, 780, 867 P.2d 1160, 1162 (App. 1994); Friberg, 687 P.2d at 834; City of Scottsdale v. CGP-Aberdeen, L.L.C., 217 Ariz. 626, 635, 177 P.3d 1198, 1207 (App. 2008); Saratoga Fire Protection District v. Hackett, 97 Cal. App. 4th 895, 903, 118 Cal. Rptr. 2d 696, 701-02 (2002). Our research indicates that the courts of several other states have reached the same conclusion as well. See Township of Piscataway, 947 A.2d at 671; In re Chittenden Solid Waste District, 182 Vt. 38, 52, 928 A.2d 1183, 1193 (2007); Orono-Veazie Water District v. Penobscot County Water Co., 348 A.2d 249 (Me. 1975). We are aware of no contrary decisions issued after Kirby. All of these courts have given effect to Kirby's declaration that, although the various states are free to develop their own methods of determining just compensation, whatever method is chosen must ensure that "the compensation paid to the owner of condemned land does not fall substantially below the fair market value of the property on the date of the taking." Kirby, 467 U.S. at 19 n.30, 81 L. Ed. 2d at 16 n.30, 104 S. Ct. at 2199 n.30. Illinois must join their ranks.

If the trial court determines that the jury's verdict did not provide the defendants with just compensation in this case, and that section 7--121 therefore cannot constitutionally be applied here, the plaintiff may wish to consider whether it still wishes to acquire the Property at its likely new value. Condemning bodies may abandon a taking at any time until they actually acquire title to the land. West Suburban Bank, 161 Ill. 2d at 456. Although the plaintiff here properly deposited the amount of the jury verdict following the trial, it has not taken possession of the Property, due to the pendency of this appeal. Our ruling in this case, which departs from the previous law of Illinois, would cause prejudice to the plaintiff if the plaintiff were not given the opportunity to abandon the

taking now that the cost of acquiring the Property might be substantially higher. Thus, in this case we hold that the plaintiff may abandon the taking if it wishes and withdraw its deposit of the amount of the jury's verdict.

In the event that the plaintiff wishes to proceed with the condemnation, the trial court must set a procedure for arriving at a proper determination of just compensation for the Property. Although the exact outlines of that procedure must await consideration on remand, certain features are clear. For instance, the finder of fact in any determination of just compensation must be a jury, not a judge. Ill. Const. 1970, art. I, §15. In addition, because we have held that in this case the plaintiff remains free to abandon the condemnation and withdraw its deposit, the "date of taking" has not yet occurred. In setting a date of valuation to be used in determining just compensation on remand, therefore, the date of any new trial, rather than the December 2007 time of the plaintiff's deposit, will more closely approximate the "date of taking." Finally, we note that the compensation eventually set for the Property must be "just" not only to the landowner but also to the taxpayers who ultimately pay that compensation. Commodities Trading Corp., 339 U.S. at 123, 94 L. Ed. at 711-12, 70 S. Ct. at 549. Accordingly, on remand the trial court may consider whether to permit the jury to take into account the payment or nonpayment of real estate taxes and other similar items, in order to avoid either overcompensating or undercompensating the defendants. In establishing the particular procedures to be employed, the trial court is free to fashion any appropriate methods, so long as they will provide the defendants with just compensation, that is, the value of the Property at the time of the taking. Kirby, 467 U.S. at 17, 81 L. Ed. 2d at 15, 104 S. Ct. at 2198.

The judgment of the circuit court of Du Page County is affirmed in part and vacated in part. Specifically, we affirm the trial court's decisions granting summary judgment in favor of the plaintiff

on the issue of good-faith negotiations and granting motion in limine No. 1. We vacate the jury's verdict as to the value of the Property, subject to possible reinstatement by the trial court following a hearing on just compensation. The case is remanded for further proceedings consistent with this opinion.

Affirmed in part and vacated in part; cause remanded.

O'MALLEY and JORGENSEN, JJ., concur.